Argued and submitted September 3, decision of the Court of Appeals and judgment of the circuit court affirmed December 16, 1993, petition for reconsideration allowed by opinion February 3, 1994
See 318 Or 327, 866 P2d 463 (1994)

# WESTWOOD HOMEOWNERS ASSOCIATION, INC.,
*Respondent on Review,*

*v.*

# LANE COUNTY,
*Petitioner on Review.*

(CC 16-90-10439; CA A71452; SC S40106)

864 P2d 350

147-a

David B. Williams, Lane County Office of Legal Counsel, Eugene, argued the cause and filed the petition for petitioner on review.

Frederick A. Batson, of Gleaves, Swearingen, Larsen, Potter, Scott & Smith, Eugene, argued the cause and filed responses to the petition for review.

J. David Bennett, of Copeland, Landye, Bennett and Wolf, Portland, filed an *amicus curiae* brief on behalf of Community Associations Institute, Oregon Land Title Association, and Oregon State Homebuilders Association.

UNIS, J.

## UNIS, J.

ORS 312.270(1) provides that "[w]hen a county acquires real property by foreclosure for delinquent taxes, the conveyance vests in the county title to the property, free from all liens and encumbrances." The issue in this case is whether, under that statute, servitudes[1] that benefit and burden individual lots in a planned unit development[2] survive a tax foreclosure sale at which a county acquires title. We hold that they do survive.

Westwood Homeowners Association (the Association) manages the Westwood Planned Unit Development (Westwood PUD), which was established in March 1980. Every owner of a lot[3] in Westwood PUD is automatically and mandatorily a member of the Association. At the time of Westwood PUD's creation, the developer executed and recorded a planned community "declaration" of the type now required by ORS 94.565.[4] The declaration included various

---

[1] *See infra,* note 8.

[2] The words "planned unit development" and "planned community," *see infra,* note 4, are used interchangeably in this opinion.

[3] In this opinion, a "lot" refers to a unit of land within Westwood PUD. See ORS 92.010 for a similar definition of "lot" in a planned community established under ORS 94.550 to ORS 94.783, the Oregon Planned Community Act. *See* ORS 94.575 (ORS 92.010 applies to planned communities established under ORS 94.550 to 94.783).

[4] The Oregon Planned Community Act was enacted into law in 1981. Or Laws 1981, ch 782. The Oregon Planned Community Act regulates some, but not all, planned unit developments. *See* ORS 94.570 (listing planned unit developments not governed by the Oregon Planned Community Act). Westwood PUD was developed before the Oregon Planned Community Act's effective date of July 1, 1982. Nevertheless, the parties in this case agree, as do we, that the Oregon Planned Community Act is useful for analytical purposes even when it is not expressly applicable to a particular homeowner's association.

ORS 92.012 provides:

"No land may be subdivided or partitioned except in accordance with ORS 92.010 to 92.190."

ORS 94.550(9) provides:

" 'Planned community' means any subdivision under ORS 92.010 to 92.190 which results in a pattern of ownership of real property and all the buildings, improvements and rights located on or belonging to the real property, in which:

"(a) There is a homeowners association responsible for the maintenance, operation, insurance and property taxes relating to any common property of the planned community or for the exterior maintenance of any property that is individually owned; and

Covenants, Conditions, and Restrictions (CCRs) that affect each lot in Westwood PUD.[5] The declaration states that "all of the properties" in Westwood PUD "shall be held, sold and conveyed" subject to the CCRs, "which are for the purpose of protecting the value and desirability of, and which shall run with, the real property and be binding on all parties having any right, title or interest in the [Westwood PUD] properties or any part thereof, their heirs, successors and assigns, and shall inure to the benefit of each owner thereof." Each deed issued to a lot in Westwood PUD, therefore, binds the grantee to adhere to the CCRs contained in the recorded declaration.

Some of the CCRs are restrictive (*e.g.*, some prohibit the building of structures in certain ways), while others require the owner to do an affirmative act or to continue the status quo. The CCRs provide that "each [o]wner of any [l]ot by acceptance of a deed therefor * * * is deemed to covenant and agree to pay to the Association: (1) annual assessments or charges * * * and (2) special assessments for capital improvements." The CCRs state that the assessments levied by the Association shall be used exclusively to promote the recreation, health, safety, and welfare of Westwood PUD residents and for the improvement and maintenance of the common area and of the homes situated in Westwood PUD. The CCRs further provide that such annual and special assessments "shall be a charge on the [l]ot and *shall be a continuing lien upon the lot* and any improvements thereon against which each such assessment is made." (Emphasis added.) Thus, the failure to pay the assessments results in the Association having a lien on the lot to secure payment of the assessments, a lien which the Association can enforce.

---

"(b) Owners of individual lots, by virtue of their ownership, automatically are members of the homeowners association and assume liability for membership fees."

[5] The CCRs establish architectural standards for the neighborhood and provide for the equal sharing of costs to maintain the roads in Westwood PUD, for the maintenance of certain exterior appearance standards for dwellings if the owner fails to maintain the dwelling, and for the maintenance of those common area facilities. The declaration also establishes certain utility easements. The CCRs provide, *inter alia*, that the Association may assess each lot for common expenses, for a reserve account, and for replacing common property.

On May 27, 1988, Lane County acquired title to 15 lots in Westwood PUD as a result of statutory tax foreclosure proceedings under ORS chapter 312 for nonpayment of real property taxes.[6] After the tax foreclosure sale, the Association made assessments against each of the 15 lots for road and common area maintenance fees that were incurred *after* Lane County acquired title to the 15 lots. Lane County refused to pay those charges.

In 1990, the Association filed an action in Lane County Circuit Court to foreclose the Association's lien on the 15 lots for the approximately $18,000 in unpaid assessments that had accumulated between January 1988 and August 1990 after Lane County became record title holder of the 15 lots. Lane County filed a counterclaim to quiet title or to foreclose the Association's lien if it had not been extinguished by the tax foreclosure. Both parties moved for summary judgment. Relying on the provisions of ORS 311.405(7)[7] and ORS 312.270(1), Lane County argued that the CCRs and the Association's power under the CCRs to make assessments against property in Westwood PUD created "liens" or "encumbrances" within the meaning of ORS 312.270(1), with the result that Lane County had acquired title by tax collector's deed to each of the 15 lots through the statutory tax foreclosure process "free from all liens and encumbrances." It follows, argued Lane County, that under ORS 312.270(1), the tax foreclosure had extinguished not only all pre-foreclosure liens resulting from assessments against the 15 lots made under the CCRs, but also the CCRs, including the Association's power under the CCRs to make annual and special assessments against the 15 lots. Without the power under the CCRs to make annual and special assessments against the 15 lots for the purposes specified in the CCRs, the Association had no right to make post-tax-

---

[6] In 1986, Lane County initiated the statutory foreclosure proceedings. On January 28, 1987, a judgment and decree of foreclosure was entered, foreclosing the 15 lots for nonpayment of real property taxes. As required by statutes then in effect, those properties were held by the Lane County Assessor, acting as the Lane County Tax Collector, for a redemption period of one year. The current redemption period is two years. ORS 312.120. None of the 15 lots was redeemed. On May 27, 1988, the Lane County Tax Collector deeded title to the 15 lots to Lane County in accordance with the provisions of ORS 312.120 and ORS 312.200.

[7] ORS 311.405(7) is set forth *infra*, 318 Or at 155.

foreclosure assessments or charges against the 15 lots; therefore, Lane County reasoned, the Association had no lien to foreclose on the 15 lots.

The Association's position was that although its liens for pre-foreclosure assessments on the 15 lots were extinguished by the tax foreclosure sale, the CCRs and the Association's power to make assessments were not themselves extinguished. The Association asserted that lots owned by other Westwood PUD homeowners benefit from the CCRs, which it asserted are "servitudes," not "liens" or "encumbrances."

The trial court granted summary judgment for the Association, allowed the Association to foreclose against Lane County, and denied Lane County any relief on its counterclaim.

On appeal by Lane County, the Court of Appeals affirmed. *Westwood Homeowners Assn., Inc. v. Lane County*, 118 Or App 310, 847 P2d 862 (1993). That court held that the CCRs and the Association's power to assess under the CCRs were not "liens or encumbrances" under ORS 312.270(1). The court further held that the term "encumbrances," as used in ORS 311.405(7) and ORS 312.270(1), "includes only those encumbrances [that are in the nature of] money or security interests in the subject property." *Westwood Homeowners Assn., Inc. v. Lane County, supra*, 118 Or App at 315. "The CCRs are not money or security interests in the subject property." *Id.* Accordingly, the Court of Appeals held that while the Association's pre-foreclosure assessments were extinguished by the property foreclosure proceedings, the CCRs were not. *Id.* The Court of Appeals held that the Association "is still authorized to assess post-tax-foreclosure charges against the subject lots for the purposes specified in the CCRs" and concluded that "[s]ummary judgment was appropriately granted" by the trial court to the Association. *Id.*

We allowed Lane County's petition for review to determine the effect of the statutory tax foreclosure sale on the CCRs and the Association's power under the CCRs to make post-tax-foreclosure annual and special assessments against the 15 lots in Westwood PUD. For the reasons that

follow, we hold that the tax foreclosure does not extinguish or render extinguishable the CCRs or the Association's power under the CCRs to make post-tax-foreclosure assessments against the 15 lots in Westwood PUD. We affirm the decision of the Court of Appeals and the judgment of the circuit court.

In order to keep before us the precise type of the interest in land that the CCRs create, we begin with a discussion of the nature of the CCRs in the Westwood PUD arrangement, including the power of the Association to make annual and special assessments. The Westwood PUD declaration, as executed and recorded by the developer, binds the lots to the CCRs. Each deed issued to a lot in Westwood PUD binds "all parties having any right, title or interest in the [lot] or any part thereof, their heirs, successors and assigns," to adhere to the CCRs. The CCRs run with the lots and are enforceable by and against the assignees, remote grantees, heirs, and successors of the original owners. Each lot owner may enforce the CCRs against every other lot owner in Westwood PUD, including remote assignees and grantees. The declaration, including the CCRs, is recorded to constitute constructive notice to all subsequent purchasers.

The CCRs are "servitudes"[8] with multiple benefits and burdens. The rights of the lot owners are reciprocal and mutually enforceable. The beneficiaries of the servitudes are the lot owners whose property is rendered more valuable and desirable by the servitudes. The benefited property is called the "dominant estate" or "dominant tenement." The servitude is said to be "appurtenant" to the dominant estate. The burdened property is called the "servient estate" or "servient tenement." Each lot within Westwood PUD is, therefore, both the dominant and the servient estate or tenement with respect to the CCRs involved; the benefits and burdens of mutual promises attach to the ownership of each lot. *See* Natelson, Law of Property Owner Associations 50, § 2.3.3.

---

[8]

"A *servitude* is a private right (other than a future possessory interest or lien) held by a person or group and, under certain defined circumstances by their successors-in- interest, to use real property possessed by another or to limit the possessor's enjoyment of same, which right is, under certain defined circumstances, binding upon the property possessor's successors-in-interest." Natelson, Law of Property Owners Associations 38, § 2.1 (1989) (emphasis in original).

(1989) (explaining concept). The servitudes themselves are "interests in land in the same family as easements." Cunningham, Stoebuck, and Whitman, The Law of Property 494, § 8.27 (1984).[9]

■    Whether the CCRs survive the statutory tax foreclosure sale turns on the meaning of the terms "liens" and "encumbrances" in ORS 312.270(1). In interpreting a statute, our task is to discern the intent of the legislature. ORS 174.020; *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). We must, therefore, attempt to determine whether the legislature intended by its use of the terms "liens" and "encumbrances" in ORS 312.270(1) to include within its scope servitudes like those created by the Westwood PUD CCRs. To do that, we begin with an examination of the text and the context of the statute. *PGE v. Bureau of Labor and Industries, supra*, 317 Or at 610. The context of the statutory provision at issue includes other provisions of the same statute and other related statutes. *Id.* at 611.

As a threshold matter, we observe that neither "lien" nor "encumbrance" is defined in ORS chapter 311, which governs the collection of property taxes, or in ORS chapter 312, which sets forth the provisions for foreclosure of property tax liens. We separate our discussion of the issue of the meaning of those terms for purposes of convenience. The first question, the meaning of "lien," is easily answered from the statutory text and context alone.

■    The term "lien" has a common and well-understood meaning. A "lien" is a "claim, encumbrance, or charge on property for payment of some debt, obligation or duty." Black's Law Dictionary 922 (6th ed 1990). "A lien is a security right given to a person to sell or seize the collateral subject to the lien." Natelson, *supra*, at 39, § 2.1. In the absence of some suggestion in the statute's text or context that a different meaning was intended, we can apply the foregoing definition to the facts of this case. When we do, the power to make assessments and a covenant to pay assessments are readily

---

[9] A servitude may further any one of at least three purposes: (1) afford the beneficiary (*i.e.*, the dominant owner) the right to use the servient land; (2) deny or restrict the servient owner (or his tenant) the right to use his or her own land in a certain way; and (3) require the servient owner (or tenant) to perform affirmative acts on or relating to his land. Natelson, *supra*, at 40-41, § 2.1; *id.* at 45, § 2.3.1.

distinguishable from a lien for past-due assessments. From our discussion of the nature or character of the CCRs and the Association's power to make annual and special assessments against the lots in Westwood PUD, it is clear that the CCRs and the Association's power to make assessments clearly are not "liens."

Further support for the proposition that servitudes are not liens can be found in *Crawford et al v. Senosky et al*, 128 Or 229, 274 P 306 (1929). In that case, this court stated that "the foreclosure of a tax lien does not cut off easements that have been carved out of one property for the benefit of another." *Id.* at 232. The court added:

> " 'An easement is a servitude upon, and differs from an interest in, or lien upon, the land. It is not a part of, but is so much carved out of the estate in, the land, and is as much a thing apart from that estate as a parcel of the land itself conveyed from it.' " *Id.* at 233 (quoting *Jackson v. Smith*, 153 App Div 724, 138 NY Supp 654 (1912)).

Until and unless the Association exercises its power to make annual or special assessments against a particular lot in Westwood PUD for the purposes specified in the CCRs, there is no lien against that lot, *i.e.*, there is no claim or charge on the lot for payment of some debt, obligation, or duty. We hold that the servitudes created by the Westwood PUD CCRs are not "liens," as that term is used in ORS 312.270(1).

The more difficult question is whether the CCRs, which include the Association's power to make annual or special assessments against the lots within the Westwood PUD, are "encumbrances," as that term is used in ORS 312.270(1). Unlike the question concerning "liens," this question cannot be resolved based on the statutory wording. The term "encumbrance" may mean different things in different contexts. In the context of a grantor's covenant in a warranty deed, in the form required by ORS 93.850,[10] that the premises are "free and clear of all encumbrances," this court in *Leach v. Gunnarson*, 290 Or 31, 39, 619 P2d 263

---

[10] In *Leach v. Gunnarson*, 290 Or 31, 39, 619 P2d 1263 (1980), this court stated that ORS 93.850, which provides a form of warranty deed, "require[s] a grantor who covenants against encumbrances in a warranty deed to be liable to the grantee if the real property, as of the date of the deed, is encumbered by any interest not expressly excluded from the scope of the covenant against encumbrances."

(1980), stated that "encumbrance" means "any right to or interest in the land, subsisting in a third person, to the diminution of the value of the land, though consistent with the passing of the fee by conveyance." (Internal quotation marks omitted.)

The word "encumbrance," as used in ORS 312.270(1), could also mean, as the Court of Appeals held in this case, "only those encumbrances that are [in the nature of] money or security interests in the subject property." *Westwood Homeowners Assn., Inc. v. Lane County, supra,* 118 Or App at 315. *See also* Black's Law Dictionary, *supra,* at 527 (an "encumbrance" is a "claim, lien, charge, or liability attached to and binding real property").

The meaning attributed to the term "encumbrances" in ORS 312.270(1) by the Court of Appeals is supported by the terms of a related statute, ORS 311.405-(7)(a), which provides:

> "* * * liens for *ad valorem* taxes * * * are superior to, have priority over and *shall be fully satisfied before all other liens, judgments, mortgages, security interests or encumbrances* on the property without regard to date of creation, filing or recording." (Emphasis added.)

The requirement that ad valorem taxes be fully satisfied before "encumbrances" suggests that the term "encumbrances," as used in ORS 311.405(7)(a), relates to a claim for money or a security interest in the subject property.

The foregoing conclusion is bolstered by an examination of the method under which real property is assessed for taxation purposes, set out in ORS 308.235(1) and OAR 150-308.205-(A), *see infra* at 156. In *Crawford et al v. Senosky et al, supra,* this court held that a restrictive covenant (servitude) was not extinguished by a tax sale under a former statute. The court followed the "tax assessment approach," which focuses on the actual assessed value of property on which the tax lien is based.

> "The property assessed and the property conveyed upon the tax sale must be the same. If the assessment is only of the servient estate, only that can be conveyed on a tax sale; and, *vice versa,* if the conveyance on the tax sale, or on the foreclosure of a tax lien, is of all the estate or interests in the land, freed from servitude as well as liens thereon, then the

assessment must be based upon the land as land, regardless of servitude as well as liens. * * * [I]n making the assessment a deduction must be made for easements, whereas none is made for liens and the like interests." *Id.* at 234 (quoting *Jackson v. Smith, supra,* 153 App Div at 724).

Under the tax assessment approach, the only interests transferred by a tax sale are those interests that were assessed in establishing the value of the property for ad valorem tax purposes.[11] Any interest not assessed would not be transferred by the tax foreclosure deed and would remain in effect. *See Crawford et al v. Senosky et al, supra,* 128 Or at 232-34 (restrictive covenant survives tax sale because, under the tax assessment approach, the tax sale vendee acquires a purely derivative title, which leaves the servitude untouched).

The current method of assessing real property for ad valorem taxes is found in ORS 308.235(1) and OAR 150-308.205-(A). ORS 308.235(1) provides in part:

"Taxable real property shall be assessed by a method which takes into consideration:

"(a) The applicable land use plans, including current zoning and other governmental land use restrictions;

"(b) The improvements on the land and in the surrounding country and also the use, earning power and usefulness of the improvements, and *any rights or privileges attached thereto or connected therewith*[.]" (Emphasis added.)

OAR 150-308.205-(A)(1)(b), which relates to real property valuation for tax purposes, states: " *'Real property' means the real estate* (physical land and appurtenances including structures * * *) *and all interests, benefits, and rights inherent in the ownership of the physical real estate.*" (Emphasis added.)

Under the current approach to taxing real property, it is reasonable to assume that the tax payable on a dominant lot is assessed not only on the lot itself, but also on any

---

[11] The tax assessment approach has been criticized as being unrealistic and artificial because, it is asserted, tax assessors rarely have the time or inclination to concern themselves with nonvisible servitudes. Note, *The Effect of Tax Foreclosure Sales on Servitudes: Olympia v. Palzer,* 11 Puget Sound L Rev 193, 200 (1987); Kratovil, *Tax Titles: Extinguishment of Easements, Building Restrictions, and Covenants,* 19 Houston L Rev 55, 57-58 (1981). The tax assessment approach is, however, accepted by the Restatement of Property § 509, comment a (1944).

servitudes beneficial to the dominant lot. Applying the current method of assessing real property for ad valorem taxes to servitudes, the burden of a servitude would tend to lower the assessed value of the servient estate, resulting in a lower tax liability. In effect, the servitude is carved out of the land being taxed. On the other hand, the benefit of the servitude would enhance the value of the dominant estate and result in an increased tax liability. Thus, if the servitude is assessed with the dominant tenement, the servitude should be secure from the effect of a tax foreclosure deed.

Each lot in Westwood PUD is assessed at 100 percent of its real market value. As previously stated, each lot in Westwood PUD is both a dominant and a servient estate or tenement with respect to the servitudes (CCRs). The servitude benefits run in favor of the other lots in Westwood PUD as a dominant tenement. The servitude burdens run as to each lot in the Westwood PUD scheme as a servient tenement. There are, in other words, mutual and reciprocal cross-servitudes as to each lot in Westwood PUD. Applying the tax assessment approach to this case, Lane County acquired in the tax foreclosure sale the interests taxed. The dominant servitudes of the other lot owners of Westwood PUD thus would survive the tax foreclosure sale.

The foregoing notwithstanding, the text and context of ORS 312.270(1) do not provide definitive insight into the legislative intent as to whether servitudes are "encumbrances," as that term is used in that statute. Either answer is plausible. It is, therefore, appropriate to consider legislative history. *See PGE v. Bureau of Labor and Industries, supra,* 317 Or at 611-12 (explaining methodology). When this court reaches legislative history, we consider it along with text and context to determine whether all of those together make legislative intent clear. *Id.* at 612.

Although the legislative history of ORS 312.270 does not definitively resolve the ambiguity as to what the legislature intended as to the meaning of "encumbrances" in ORS 312.270(1), it does provide a theme that we consider to be useful. The predecessor to ORS 312.270 was first enacted in 1919. Or Laws 1919, ch 239, § 6. At that time, the section provided that in a tax foreclosure the county took title "free and clear of any assessments for local improvements levied by

any municipal corporation," but the municipal corporation had a right to protect its assessments by purchasing the property pursuant to certain procedures. *Id.* In 1925, the section was amended to provide that when a municipal corporation exercised its right to purchase, it took title "superior to any lien, claim or charge whatever against such lands," with certain exceptions not relevant here. Or Laws 1925, ch 203, § 2. The language at issue in this case was added in 1933, at which time the section provided that the county took title "free from all liens and incumbrances [*sic*],"[12] and the municipal corporation, which retained the right to purchase the property, took "superior to any lien, claim or charge whatever" against the property. Or Laws 1933, ch 283, § 1. We have been unable to unearth any legislative history indicating the purpose for those amendments, nor what particular meaning of "encumbrances" the legislature intended to use when it added that term. But all of the earlier permutations of that statute appear to have focused on various forms of money charges against property, not on interests such as easements or servitudes. We find no basis for concluding that the legislature intended to change the focus of its policy in 1933. Thus, although legislative history is not dispositive, it is indicative.

■  After consideration of text, context, and legislative history, the intent of the legislature as to the meaning of the word "encumbrances" in ORS 312.270(7) remains unsettled, although a likely meaning has emerged. Resort to general maxims of statutory construction to aid in resolving the remaining uncertainty is, therefore, permissible. *PGE v. Bureau of Labor and Industries, supra,* 317 Or at 612. "Those include * * * the maxim that, where no legislative history exists, the court will attempt to determine how the legislature would have intended the statute to be applied had it considered the issue." *Id.* (citing *Security State Bank v. Luebke,* 303 Or 418, 423, 737 P2d 586 (1987)).

■  Consistent with our reading of the legislative history, there are several reasons that persuade us that the legislature would have intended to exclude servitudes from the meaning of the term "encumbrances" in ORS 312.270(1). The CCRs in

---

[12] In 1937, the spelling was changed from "incumbrances" to "encumbrances." Or Laws 1937, ch 137, § 1.

a planned community are important land use planning devices. CCRs enhance the value and enjoyment of planned community property and induce purchasers to buy lots in the development. Survival of those servitudes ensures that the planned community maintains its planned character. The servitudes are of great importance to the tranquility and the general welfare of the homeowners in a planned unit development, such as Westwood PUD. The purchasers of property in a planned community rely on the stability of the planned community arrangement as an assurance that a particular type of lifestyle is maintained. The enforcement of servitudes is essential to foster planned community development. If the benefits of the servitudes, which the lot owners have enjoyed, are extinguished as a result of a tax foreclosure sale, potentially disastrous consequences could result. We do not believe that the legislature would have intended the planned character of a community, such as Westwood PUD, and the expectations of the homeowners to be defeated in this way.

Indeed, in enacting ORS 94.550 to 94.783, the Oregon Planned Community Act, ORS 94.785, the Legislative Assembly recognized the socio-economic utility of private land controls and the importance of protecting the interests of the owners of lots in a planned community:

> "It is a matter of statewide concern that the Legislative Assembly address problems associated with homeowners associations in order to make this kind of home ownership pattern an acceptable choice and in order to assure proper maintenance of the projects so that the investment of the owners and the appearance of Oregon communities are protected." ORS 94.560(5).

Clearly, the preservation of a neighborhood through a general plan of servitudes is favored by the legislature. Servitudes that run with the land have an important place in land use planning. ORS 94.560(5) expresses a strong public policy in favor of preserving the valuable interests of such servitudes, protecting the expectations of homeowners, and preventing damage to private land use planning programs. "If the sale of land for nonpayment of taxes extinguishes the burden of a covenant respecting the use of the land sold, then an entire subdivision can have the value of each of its lots seriously impaired by the tax delinquency of a single lot

owner." 5 Powell, The Law of Property 60-157, ¶ 679[4] (Gruber rev 1993).

We further note that to hold that the tax foreclosure sale extinguished the CCRs arguably would deprive Lane County of all servitude benefits that are appurtenant to those lots as dominant estates. We do not believe that the legislature would have intended such a result. We believe that the legislature would, instead, have intended to protect the servitude benefits to both the dominant and servient estates. Stated differently, we believe that the legislature would have intended that a county, at a tax foreclosure sale, acquires all servitude benefits (such as the benefit from the common areas and road maintenance activity) that are appurtenant to the title to the properties acquired.

There is yet another reason to support the conclusion that the legislature would have intended the word "encumbrances" to relate to only claims for money or security interests in the subject property. When, after consideration of the text, context, and legislative history, the meaning of a statute is unclear, this court will construe the statute so as to satisfy the constitution. *See State v. Edgmand,* 306 Or 535, 540, 761 P2d 505 (1988) (court is to preserve the legislature's intended purpose to the extent that the statute can be construed to avoid constitutional problems). As previously stated, if the tax assessment is only of the servient estate, as required by ORS 308.235(1) and OAR 150-308.205-(A)(1)(b), a tax foreclosure that extinguishes servitudes of the dominant estate arguably would infringe on the constitutional rights of the owners of the dominant tenements, depriving them of their property without due process of law. *See Crawford et al v. Senosky et al, supra,* 128 Or at 233 (" 'If property rights which are excluded from an assessment are sold or extinguished by a tax sale, there would be a taking of property without due process of law' ") (quoting *Tax Lien Co. v. Schultze,* 213 NY 9, 106 NE 751 (1914)). We see no reason to assume that the legislature would wish to raise such questions.

In sum, we do not believe that the legislature, in enacting ORS 312.270(1), would have intended to extinguish servitudes in a tax foreclosure sale in which the county

acquires title to property. We hold that the word "encumbrances" in ORS 312.270(1) does not include servitudes. Consequently, the tax sale of the 15 lots in Westwood PUD did not extinguish the CCRs or the Association's power to make post-tax-foreclosure assessments. Lane County, therefore, took title to the 15 lots in Westwood PUD subject to the servitudes.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.