Submitted on remand from the Oregon Supreme Court August 29, 1995; resubmitted In Banc January 9, reversed and remanded February 21, petition for review denied May 28, 1996 (323 Or 265)

# STATE OF OREGON,
*Respondent,*

*v.*

# JENARO AGUILAR,
*Appellant.*

## (C88-06-33882; CA A70129)

912 P2d 379

Liza Jane Langford argued the cause and filed the brief for appellant.

Mary H. Williams, Assistant Attorney General, argued the cause for respondent. With her on the brief were Charles S. Crookham, Attorney General, and Virginia L. Linder, Solicitor General.

DEITS, J.

Edmonds, J., dissenting.

**DEITS, J.**

Defendant appealed from his convictions for posses-
sion and distribution of a controlled substance, ORS 475.992,
arguing that the trial court erred in denying his motion to
suppress. We affirmed the trial court's denial of the motion,
126 Or App 22, 867 P2d 520 (1994). The Supreme Court has
remanded for reconsideration, *State v. Aguilar*, 321 Or 378,
899 P2d 690 (1995), in the light of *State v. Dominguez-
Martinez*, 321 Or 206, 895 P2d 306 (1995). We reverse and
remand.

On June 4, 1988, Officer Kelley saw defendant get
into a car parked in front of what he believed to be an
operating drug house on Roselawn Street. As the car pulled
away from the curb, Kelley observed a black man, whom he
believed to be Stephens, the reputed operator of the drug
house, jog from the area where the car had been parked, up
the stairs, and into the suspected drug house. He did not see
any contact between the two men.

About five weeks earlier, on April 29, 1988, Kelley
and Officer Weatheroy had witnessed what they believed
was a drug transaction in front of the same house. While in
the course of citing and releasing a person for shoplifting at a
location near the suspected drug house, Kelley testified that
he saw a car pull away from the curb and a person, whom he
believed to be Stephens, run into the house from the car.
Weatheroy testified that he saw that person get into the car
for about a minute and then go back into the house after the
car pulled away from the curb. Weatheroy said that based on
his observations, it was his belief that a drug transaction had
occurred in the car. He also said that he had shared all of his
observations at that time with Kelley. Kelley and Weatheroy
then followed the car that had pulled away from the curb and
stopped it for a traffic violation. They found controlled sub-
stances in the car, and the driver of the car admitted to
Weatheroy that he had sold cocaine and heroin to Stephens
at the house on Roselawn.

After watching the events of June 4, Kelley followed
defendant's car. Defendant appeared to be in a hurry and
twice failed to signal before making turns. Kelley then
stopped defendant. He testified that he stopped defendant

for a traffic violation, as well as to investigate his suspicions that a drug transaction had occurred at the Roselawn house. Kelley asked defendant for his driver's license and a bill of sale for the car. Defendant provided both. Kelley then asked defendant: "Do you have any drugs on you or in your vehicle?" Defendant responded: "I don't think so." He then asked for and obtained defendant's consent to search his person and the vehicle.[1] After obtaining consent, Kelley requested a cover car and, while he waited for it to arrive, he searched defendant and found money and a pager. When the other officers arrived, Kelley searched the car and found two baggies of heroin. He then arrested defendant and found another bag of heroin and some marijuana on defendant's person.

Defendant moved to suppress all of the evidence gained pursuant to the searches of his person and the vehicle. The trial court denied the motion, making the following findings:

"[O]n the date in question Officer Kelley knew, based upon the information given to him by prior citizens' complaints, including the complaint of the upstairs resident of this particular incident, who was a relative of [Stephens], that the resident — the address on Northeast Roselawn was, in fact, an operating, ongoing drug house; that Officer Kelley was aware of the information disclosed in a prior arrest * * * by Officer Weatheroy, and that Officer Weatheroy had, prior to the date in question, shared that information with Officer Kelley.

"The Court finds that Officer Kelley, based upon his experience, knew on the date in incident of a drug profile pertaining to the delivery of controlled substances, and that drug profile includes a short stay at the residence in the distribution, the delivery is usually done at the door, or just inside the door with a very short stay. Officer Kelley, at the day of the incident, observed the Defendant's vehicle in the area of and adjacent to the premises on Northeast Roselawn. That as the vehicle left the area a gentleman believed to be [Stephens], the operator of the [drug house], left the area of Defendant's vehicle and approached the residence.

---

[1] There is no question that the request took place during the course of the traffic stop.

"The Court finds that Officer Weatheroy and Officer Kelley followed the Defendant. The Court finds that the Defendant operated his vehicle in a manner indicating that he was in a hurry. The Court finds that the Defendant made turns * * * without the benefit of a signal, as required by the statute. The Court finds that the Defendant was stopped as a result of the traffic infractions occurring in the presence of the officers, the failure to signal.

"The Court finds that Officer Kelley then inquired, 'Do you have any drugs on you or in your vehicle?' The Court finds that the Defendant's response was, 'I don't think so.' The Court finds that Officer Kelley asked the Defendant if he would allow himself and the vehicle to be searched; the Court finds that * * * the Defendant's response was yes, and that the Defendant then stepped out of the vehicle without any request by the officer. * * * The Court finds that the drugs on the person of the Defendant were found pursuant to his consent to be searched."

Defendant argues that the trial court's denial of his motion to suppress was error, because Kelley exceeded the permissible scope of a traffic stop when he asked defendant about drugs and for consent to search for drugs. Defendant also argues that Kelley lacked a reasonable suspicion to believe that defendant was involved in a drug transaction that would justify stopping defendant and that his consent to search was involuntary.

In our original opinion in this case, *State v. Aguilar*, 126 Or App 22, 28, 867 P2d 520 (1994), we concluded that Kelley's questioning of defendant about drugs and requesting consent to a search for drugs was permissible even though the inquiry occurred during a stop for a traffic infraction. We ultimately concluded that defendant's consent was voluntary, and that, therefore, the trial court properly denied defendant's motion to suppress. *Id*. Consequently, we considered it unnecessary to determine whether Kelley had a reasonable suspicion to stop defendant for drug offenses.

Subsequently, in *State v. Dominguez-Martinez*, the Supreme Court held that ORS 810.410 "defines the parameters of police authority to detain and investigate during a traffic stop." 321 Or at 212. The court explained:

"[I]t is clear that, under ORS 810.410, a police officer has authority to stop a vehicle and detain the occupants in order to investigate a traffic infraction that he or she has witnessed. *It is also clear, however, that an officer who stops a person for a traffic infraction may investigate only that infraction, unless the state can point to some basis other than the traffic infraction to broaden the scope of the investigation.*" *Id.* (emphasis supplied; footnote omitted).

■ On reconsideration, in the light of *Dominguez-Martinez*, we conclude that Kelley lacked authority, based solely on his belief that defendant had committed a traffic infraction, to ask defendant about drugs or request his consent to a search for drugs.[2] However, under *Dominguez-Martinez*, if Kelley had "some basis" to believe that defendant had committed a drug-related crime, it would have been permissible

---

[2] Contrary to the dissent's suggestions, as to the basis of our holding, our conclusion is compelled by a reasonable reading of the Supreme Court's interpretation of ORS 810.410 in *State v. Dominguez-Martinez*, 321 Or 206, 212, 895 P2d 306 (1995). The court very clearly stated:

"Under ORS 810.410, * * * an officer who stops a person for a traffic infraction may investigate only that infraction, unless the state can point to some basis other than the traffic infraction to broaden the scope of the investigation." *Id.*

Although that statutory interpretation did not directly compel the result in *Dominguez-Martinez*, that does not allow us to completely disregard it. In its selective quotation of *Dominguez-Martinez*, the dissent omits the court's description of the properly limited scope of the officer's *investigation* under the court's interpretation of ORS 810.410:

"In this case, the trooper stopped defendant for making unsignaled lane changes. Under ORS 810.410(3)(b), the trooper was authorized to conduct an investigation 'reasonably related to the traffic infraction.' *In other words, in relation to the traffic infraction of unsignaled change of lane, the officer had authority to inspect the turn signals on the automobile, to decide whether to cite defendant * * * and to issue a warning about the defective turn signal. * * * All those acts were 'reasonably related to the traffic infraction * * * and issuance of citation.'* ORS 810.410(3)(b).

"But, the trooper did not stop with that limited detention and *focused investigation.*" *Id.* at 212-13 (emphasis supplied).

The court's interpretation of ORS 810.410 becomes a part of its meaning as though it were written in its text. *Walther v. SAIF*, 312 Or 147, 149, 817 P2d 292 (1991). Although the Supreme Court's language may technically be dicta, it does not follow that it is of "no legal import." *State v. Aguilar*, 139 Or App at 191 (Edmonds, J., dissenting). We believe that a reasonable reading of the Supreme Court's statements in *Dominguez-Martinez* requires us to conclude that ORS 810.410, as applied to the facts of this case, is not open to interpretation. This is particularly so in view of the fact that the dissent's reading of the statute is very similar to this court's reading in our first opinion, *State v. Aguilar*, 126 Or App 22, 867 P2d 520 (1994), with which the Supreme Court apparently did not agree.

for him to broaden the scope of the investigation to include his actions here. The state contends that, based on his observations of the activities at the Roselawn house, Kelley had a reasonable suspicion that defendant had committed a drug-related crime, thereby justifying his inquiry.

■ As a preliminary matter, we conclude that *reasonable suspicion* that a defendant has committed illegal acts, other than a traffic infraction, is the proper standard for permitting an officer to broaden the scope of an investigation during the course of a traffic stop. We recognize that there is dictum in the Supreme Court's opinion in *Dominguez-Martinez* that might be read to suggest that the proper standard to justify the expansion of the investigation is probable cause. The court stated:

> "The state argued that, notwithstanding ORS 810.410, the trooper's request for consent to search was authorized by the general statute empowering the Oregon State Police to enforce all criminal laws, ORS 181.030. That argument ignores this court's construction of ORS 810.410 in *Porter* as both a specific grant of authority and a specific limitation on authority to stop and detain a motorist in order to investigate a traffic infraction. Absent some further development within the scope of the traffic stop, such as the observation of evidence that provides *probable cause to suspect criminal activity*, the specific grant and limitation of authority is a legislatively created closed loop, fully defining the process for stopping and detaining a motorist for the purpose of investigating a traffic infraction." *Dominguez-Martinez*, 321 Or at 213-14, n 7 (emphasis supplied); *but see id.* at 213, n 6 (noting that there was no evidence that the officer had either probable cause *or* reasonable suspicion to believe that the defendant had committed a crime).

■ We do not believe, however, that the appropriate standard for taking action in excess of the proper scope of a traffic infraction investigation is probable cause. Under ORS 131.615, an officer may stop a person and make a reasonable inquiry based on reasonable suspicion to believe that the person has engaged in illegal activity. Given that fact, there is no reason why the level of suspicion necessary to expand an investigation during the course of a traffic stop should be any higher. The level of suspicion should not be elevated just

because the suspect is stopped for a traffic infraction or because the information giving rise to the suspicion is obtained during the course of a lawful traffic stop. Accordingly, if Kelly had information providing reasonable suspicion that defendant had committed a crime, other than a traffic offense, at the time that he stopped him for the traffic infraction or if he obtained information during the course of the traffic stop that would support a reasonable suspicion that defendant had committed a crime, an inquiry regarding that crime would be permissible.

■ Reasonable suspicion is defined by ORS 131.615 as "a belief that is reasonable under the totality of the circumstances existing at the time and place the peace officer acts." The standard is an "objective test of observable facts" and requires the officer "to point to specific and articulable facts that give rise to a reasonable inference that a person has committed a crime." *State v. Ehly*, 317 Or 66, 80, 854 P2d 421 (1993).

Applying that standard, we conclude that Kelley did not have information providing a reasonable suspicion that defendant had engaged in drug-related activities at the Roselawn house at the time that he stopped defendant for the traffic infraction or when he began questioning defendant about drugs. The fact that defendant entered a car that was parked in front of a known[3] drug house, without more, does not provide reasonable suspicion to believe that he had engaged in a drug transaction there. Kelley did not see defendant approach, enter, emerge from, or even walk away from the drug house. He simply saw him get into a car that was parked in front of the house. The record shows that there were many other homes and legitimate businesses located on and around the block.

In that respect, the facts here are similar to those in *State v. Moya*, 97 Or App 375, 775 P2d 927 (1989). In that case, two Portland police officers were patrolling near the Arlington Hotel in Old Town. The officers testified that the hotel was nicknamed the "Heroin Hotel," because it was a

---

[3] Defendant does not challenge the trial court's finding that Kelley knew that the Roselawn house was an operating drug house.

center of intense drug sales and use. The officers noticed the defendant parked across the street from the hotel and remembered that they had seen her in the area before. As the officers drove by, they saw the defendant looking at something in her lap. When she looked up and saw them, she appeared surprised and seemed to move the object from her lap to her purse. The officers could not see her hands or the object. The officers stopped, seized the defendant's purse, and found cocaine. The trial court denied the defendant's motion to suppress the cocaine.

We reversed the trial court, holding that the officers lacked reasonable suspicion to believe that the defendant had engaged in drug related activity:

> "Although extensive drug activity may occur in and around the Arlington Hotel, it is located in an area containing many legitimate businesses. Defendant was not seen entering or leaving the hotel; she was simply parked on the public street next to it. There is nothing inherently suspicious about parking in or 'frequenting' such an area. The location of defendant's car and her earlier presence in the area may have assumed heightened significance had the officers noticed any other indications of likely criminal activity. However, the officers did not see any drugs or drug paraphernalia before stopping her. There is nothing remarkable about examining something in one's hands, appearing startled at a sudden confrontation with the police or denying the suggestion that one is involved in wrongdoing. When all is said and done, [the] police suspected defendant for simply being where she was. That is an insufficient basis for a stop." *Moya*, 97 Or App at 378.

*Accord State v. Bea*, 107 Or App 118, 810 P2d 1328 (1991), *rev'd on other grounds* 318 Or 220, 864 P2d 854 (1993) (no reasonable suspicion to believe defendant had engaged in drug transaction based on fact that he parked near and approached suspected drug house when officers did not see him enter the house or whether anyone answered the door).

We also do not believe that defendant's proximity to the Roselawn house combined with Kelley's belief that the man seen running from the curb into the house was Stephens, the purported operator of the drug house, provided reasonable suspicion to believe that defendant had committed a drug-related offense. Kelley's identification of the man

as Stephens was rather indefinite.[4] However, even assuming that Kelley reasonably believed that the man running from the curb was Stephens, Kelley's observation of him running into the drug house from the area where defendant's car was parked did not provide a reasonable suspicion to believe that defendant had been involved in a drug transaction. There simply was not sufficient information here for Kelley to reasonably suspect that a drug transaction had actually taken place.

This is in contrast to our decision in *State v. Norman*, 66 Or App 443, 674 P2d 626, *rev den* 296 Or 712 (1984), where there was sufficient information to support a reasonable suspicion that a drug transaction had occurred. There, the officer saw the defendant and another person named Wilson engaged in a conversation outside a Portland restaurant known to be a hangout for drug dealers. The officer saw the defendant hand Wilson "a wad of bills" with his left hand while Wilson placed something in the defendant's right hand. The defendant then placed his right hand in his front pants pocket. The officer believed that he had witnessed a hand-to-hand sale of narcotics. The officer stopped the defendant, searched him, and found heroin. The trial court denied the defendant's motion to suppress and we affirmed. We concluded that the fact that the restaurant was a notorious hangout for drug dealers combined with the officer's observation of the exchange between the defendant and Wilson gave him reasonable suspicion to believe that a drug transaction had taken place.

Here, Kelley testified that he did not observe *any* interaction between defendant and the suspected operator of the drug house:

"Q. You didn't see any transaction, then, between [defendant] and the black male?

"A. No.

---

[4] On cross-examination, Kelley testified:

"I was told by previous arrests that [Stephens] was the person that ran that dope house. And on an earlier stop, * * * [a] person also said that [Stephens] was the person that he dealt with and made the delivery to. And the person that we saw matched the same physical description — I wasn't able to see his face — but the same basic physical description was that of who I believed to be [Stephens] who ran that house."

"* * * * *

"Q. [Y]ou didn't see this black male talk to [defendant]?

"A. I just saw him in the same vicinity.

"Q. Same general area?

"A. Yeah."

■ The fact that a suspected drug house operator was in the "same general area" as defendant does not provide a reasonable suspicion to believe that a drug transaction had taken place. We therefore conclude that, under the totality of the circumstances, Kelley lacked a reasonable suspicion to believe that defendant had engaged in a drug-related offense. Thus, under *Dominguez-Martinez*, Kelley's questioning of defendant about drugs and his request for consent to a search for drugs during the stop for a traffic infraction was impermissible. Accordingly, the trial court erred in denying defendant's motion to suppress.

Reversed and remanded.

**EDMONDS, J.,** dissenting.

The majority holds that Officer Kelly violated ORS 810.410(3) when, during a lawful traffic stop, he asked defendant whether defendant had any drugs on his person or in his vehicle and whether he could search defendant and his vehicle. Thus, according to the majority, the officer's mere words constituted a violation of the statute. Because I disagree that ORS 810.410(3) applies to the questions asked by Kelly, I dissent.

It is important to keep in mind that the issue before us requires us to discern the intent of the legislature and not to promulgate law that reflects our policy choices. ORS 174.020. That legal axiom is important to this case because it appears from the majority opinion that its ruling is prompted by a belief that it is bound by the Supreme Court's holding in *State v. Dominguez-Martinez*, 321 Or 206, 895 P2d 306 (1995). The correctness of that rationale depends on how broadly one interprets the holding in *Dominguez-Martinez*. It is the purpose of this opinion to demonstrate that the majority's rationale does not withstand scrutiny when the issue is analyzed properly.

When interpreting a statute, the initial inquiry regarding the intent of the legislature begins with the text and context of the statute. ORS 810.410(3)(b) provides that a police officer "[m]ay stop and detain a person for a traffic infraction for the purpose of investigation reasonably related to the traffic infraction, identification and issuance of citation." On its face, the statute says nothing about a limitation on the contents of conversation between an officer and a motorist. Moreover, in construing the same language, the Supreme Court has held that it is not self-explanatory and accordingly, it is necessary to resort to the legislative history of the statute to interpret the legislature's intent in a given context. *State v. Porter*, 312 Or 112, 116-17, 817 P2d 1306 (1991). In accordance with the proper application of the rules of statutory construction, we must follow the Supreme Court's lead.

The legislature enacted the statute in 1981 in response to the Supreme Court's decision in *Brown v. Multnomah County District Court*, 280 Or 95, 570 P2d 52 (1977). In *Brown*, the Supreme Court concluded that the criminal law enforcement procedures retained by the legislature for driving while under the influence of intoxicants, a Class A traffic infraction, contained too many penal characteristics not to be considered as a criminal prosecution under Article I, section 11, of the Oregon Constitution. Brown was charged with his first offense for driving a motor vehicle while under the influence of intoxicants (DUII). He moved in the trial court for an order for state-provided legal counsel as an indigent, for a trial by jury and to require the state to prove his guilt beyond a reasonable doubt. Those rights were expressly excluded by statute when the charged offense was a traffic infraction. The trial court allowed the defendant's motion, and the Supreme Court affirmed the trial court's ruling in the light of the entire statutory scheme involving the treatment of DUIIs. The court held that such prosecutions implicated guarantees applicable to criminal cases, and that those guarantees could not be circumvented by labeling the offenses as infractions.

As a result of the holding in *Brown*, the legislature was faced with the prospect that the same analysis would be

applied to enforcement procedures for all traffic infractions. That prospect was reinforced by the holding in *Easton v. Hurita*, 290 Or 689, 625 P2d 1290 (1981), in which the court held that under a statute restricting searches and seizures for traffic infractions, a police officer could not make a full custody arrest and lodge the motorist in jail for a minor traffic offense.

Consequently, Senate Bill 55 (later to become ORS 810.410) was introduced in the 1981 Legislative Assembly at the request of the Special Courts' Committee of the Oregon Judicial Conference. A member of the Special Courts Committee explained to the House Judiciary Committee considering the bill:

> "The purpose of Senate Bill 55 is to establish effective law enforcement procedures for traffic infractions that can be distinguished from criminal law enforcement procedures and at the same time retain authority for police officers to stop, investigate, identify and cite motorists for traffic infractions." Testimony, House Committee on the Judiciary, Subcommittee 2, SB 55, July 2, 1981, Ex. A.

The purpose of SB 55 was explained in a similar fashion in the floor debates of both the Senate and the House. Tape recording, Third reading to the Senate, June 1, 1981, Tape 97B; *see also* Tape recording, Third reading to the House, July 29, 1981, Tape 35, Track II. As is apparent from the testimony before the legislature, there is no suggestion that the legislature was concerned about what an officer says to a motorist during a traffic stop. Rather, its focus was on an effort to segregate traffic enforcement procedures from ordinary criminal procedures so as to avoid the attachment of constitutional guarantees associated with criminal offenses. Because neither the text nor the context of the statute, nor its underlying legislative history, clearly answers whether the legislature intended that the statute apply to questions asked by an officer during a traffic stop, we must look elsewhere.

After the adoption of the statute by the legislature, the law became subject to judicial interpretation. When a statute is interpreted by an appellate court, the interpretation becomes part of the meaning of the statute as if it had been written into the text at the time of its enactment, and

the principle of *stare decisis* is implicated. *Walther v. SAIF*, 312 Or 147, 149, 817 P2d 292 (1991). Based on this principle, the majority holds that the court's decision in *Dominguez-Martinez* is controlling. However, the principle of *stare decisis* does not apply when the facts of the case relied on and the facts of the cases at issue are materially different. *I-L Logging v. Mfgrs. & Wilse. Ind. Exc.*, 202 Or 277, 333, 273 P2d 212, 275 P2d 226 (1954). Because the facts in *Dominguez-Martinez* are materially different from the facts in this case, the majority errs in applying the holding in *Dominguez-Martinez* here.

To properly interpret the holding in *Dominguez-Martinez*, it is necessary to read it in the light of the language of the statute, the legislative history underlying the statute and two previous cases decided by the Supreme Court interpreting the statute. In the first, *State v. Farley*, 308 Or 91, 775 P2d 835 (1989), a police officer stopped the defendant (presumably with flashing red lights), because his vehicle had no visible license plates, an apparent traffic infraction. As the officer approached the defendant's vehicle, the officer noticed a valid temporary vehicle permit posted on the windshield. The permit allowed the vehicle to be operated without license plates and therefore satisfied the reason for the initial stop. Nonetheless, the officer continued the stop by approaching the vehicle and asking the defendant for his driver's license. The defendant presented his license and told the officer that he had no insurance. The officer detained the defendant and his vehicle while he checked on the status of the license. On the basis of the information subsequently obtained, the officer cited the defendant for driving while suspended and for driving without insurance. The court affirmed the trial court's suppression of the evidence obtained after the stop of the defendant's vehicle. It ruled that under the provisions of ORS 810.410(3), the officer's authority to stop the defendant was limited to the purposes of the investigation reasonably related to the traffic infraction of operating a vehicle without license plates. The court concluded,

> "We have reviewed the substantial legislative history submitted post-argument, and we are satisfied that the legislature, in setting the limits for *detention* and citation of traffic offenders, did not intend to force operators of vehicles

in this state to be *detained* by police for the minutes (be it 5 or 30) it takes to make a radio call to determine if there are any outstanding warrants for the operator. If a driver has committed no observed wrong, the legislature has directed that the driver be allowed to proceed." 308 Or at 95 (emphasis supplied).

The next significant Supreme Court case to interpret ORS 810.410(3)(b) was *State v. Porter*. In *Porter*, the defendant was stopped after the officer discovered that there was an arrest warrant outstanding for the car's registered owner and after observing that the defendant matched the description of the registered owner. After confirming that the defendant was the subject of the warrant, the officer arrested the defendant and placed him in the back seat of the patrol car. While making the arrest, the officer had noticed an open beer can behind the driver's seat. He returned to the defendant's car and picked up the beer can, observing that it contained some beer. He then conducted a search for more open beer cans pursuant to an investigation under the Open Container Law. While conducting that search, the officer discovered controlled substances leading to the subsequent indictment and conviction of the defendant.

The defendant argued that under ORS 810.410(3), the officer could not lawfully have searched for additional open containers because his investigation for the traffic violation for keeping an open container of an alcoholic beverage was complete when the officer found the first beer can. The Supreme Court agreed. In the light of the legislative history of the statute, the court held that the search during the traffic stop exceeded the scope of investigation permitted by the statute and that the trial court should have suppressed the evidence obtained as a result of the subsequent search. The court said, "[a] search that explores for evidence of other crimes or infractions is not 'reasonably related to *the* traffic infraction, identification and issuance of a citation.' " *Porter*, 312 Or at 120 (emphasis in original).

The holding in *Porter* was followed by *State v. Dominguez-Martinez*. There, the officer made a lawful traffic stop because the vehicle he was following had changed lanes

twice without signaling. Dominguez-Martinez was driving the vehicle. The officer took defendant's driver's license back to his patrol car where he learned by radio that the license and registration for the vehicle were in order. Then, the officer returned to the vehicle and tested the turn signals on the automobile, finding that one was defective. He told the defendant that he would not issue a citation for a defective turn signal, but that he should have the signal repaired. He then leaned forward into the automobile resting his elbow on the automobile door, returned the license and registration to the defendant, and said, "You guys are free to go, adios." The defendant started the automobile's engine. However, the officer continued to lean on the door and asked within one or two seconds, "Do you mind if I ask you a few more questions?" The subsequent questioning led to a consent to search and the discovery of controlled substances.

The *Dominguez-Martinez* court relied on its holdings in *Porter* and in *Farley* in its analysis. The court stated:

"From those cases, it is clear that, under ORS 810.410, a police officer has authority to stop a vehicle and detain the occupants in order to investigate a traffic infraction that he or she has witnessed. It also is clear, however, that an officer who stops a person for a traffic infraction may investigate only that infraction, unless the state can point to some basis other than the traffic infraction to broaden the scope of the investigation. Moreover, it is clear that, after the investigation reasonably related to the traffic infraction is complete, an officer does not have authority under ORS 810.410 to continue *to detain* the person stopped for the traffic infraction.

"In this case the officer stopped defendant for making unsignaled lane changes. * * *

"But, the trooper did not stop with that limited *detention* and focused investigation [in regard to the reason for the traffic stop]. * * *

"In this case, at the same time that the trooper was telling defendant and [his passenger] that they were free to go, he stood in the open doorway, *and defendant could not have driven away. * * *

"The trooper's authority to *detain* the two men dissipated when he completed the investigation 'reasonably related to

the traffic infraction * * * and issuance of citation.' ORS 810.410(3)(b). Thus, as in *Farley*, the officer's *authority to detain* defendant under the statute had dissipated, and the men should have 'been allowed to proceed' without further detention. Accordingly, the trooper exceeded his authority to stop and *detain* a motorist in order to conduct a traffic investigation under ORS 810.410(3).

"* * * * *

"As this court held in *Porter*, 'because the object of [ORS 810.410(3)] is to define the authority of officers to respond to a traffic infraction,' the evidence should be suppressed when police officers exceed that authority. * * *

"As in *Porter*, the trooper in this case exceeded his authority to *detain* defendant in the context of a traffic stop, and the evidence that the trooper found during the ensuing investigation should be suppressed." 321 Or at 212-14 (emphasis supplied; footnotes omitted).

*Dominguez-Martinez* and *Farley* are about unlawful detentions or restraints of liberty after a traffic stop has ended. Neither is on point factually with this case, and therefore, the principle of *stare decisis* is inapplicable. In those cases, it was the additional physical detentions of the defendants after the traffic stops had or should have ended that resulted in the court ruling that the statute had been violated. In this case, the questions were asked *during* the traffic stop, not after it terminated. In all likelihood, Kelly's questions took less than 30 seconds to ask. Certainly, there is no support in this record for a finding that the physical action of asking the questions occurred after the stop had ended or that it prolonged the duration of the stop. Because of the factual differences, *Dominguez-Martinez* and *Farley* are of no legal import under the principle of *stare decisis*. The majority's reliance on their holdings as the basis for its interpretation of the meaning of the statute is misplaced for that reason.

Similarly, the holding in *Porter* does not control the issue before us based on the principle of *stare decisis* because of material factual differences. In *Porter*, the statute was violated because the investigating officer undertook a separate search after completing his investigation of the traffic violation that was unrelated to the authorized investigation.

Here, Kelly's questions occurred during the traffic investigation, not after its completion. More importantly, his questions did not constitute a search, unlike the unlawful actions of the officer in *Porter*. As will be amplified below, the nature of the physical actions taken by an officer during a traffic stop will determine whether the statute has been violated, and a proper analysis requires that the facts of each case be evaluated independently in the light of the legislature's intent. In summary, because the questions asked by Kelly did not unlawfully detain defendant nor did they constitute an unlawful search, the principle of *stare decisis* is inapplicable, and the majority errs when it utilizes that principle as a basis for its rationale.

We are left then with an absence of any indication from the text of the statute, its legislative history and the cases interpreting it, as to whether the legislature intended the statute to reach the specific issue before us. When, after consideration of the text, context, and legislative history, the intent of the legislature as to a particular interpretation of the statute remains unsettled, we resort to a determination as to how the legislature would have intended the statute to be applied, had it considered the issue. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 612, 859 P2d 1143 (1993). Ultimately, we must give effect to the policy of the statute in the light of the legislative history and general maxims of statutory construction. *Westwood Homeowners Ass'n v. Lane County*, 318 Or 146, 158, 864 P2d 350 (1993), *adhered to as modified on recons* 318 Or 327 (1994).

The majority's result is sustainable only if it carries out a policy that the statute imposes. We know from the legislative history that the statute was intended *only* to address the concern that the prosecution of traffic violations could implicate criminal prosecution constitutional guarantees and that the legislature sought to obviate the problem by restricting the physical actions of officers to the investigation occasioned by the traffic stop. Accordingly, it necessarily followed that once a traffic investigation ended, the officer's authority under the statute also terminated. That tells us that the legislature was concerned about conduct that had constitutional implications. This case presents facts that give

rise to a different policy choice because they do not involve officer conduct after the traffic stop ends, but conduct that occurs during the traffic stop and which would be constitutionally permissible in other contexts.

The majority's result finds its genesis in the dissenting opinion in *State v. Bonham*, 120 Or App 371, 852 P2d 905, *rev den* 317 Or 584 (1993), an argument that we previously considered and rejected in that case and in *State v. Allen*, 112 Or App 70, 826 P2d 127, *rev den* 314 Or 176 (1992). In *Bonham*, a majority of this court held that a request to consent to search could be made lawfully under the statute after the traffic stop had ended. The dissenting opinion disagreed, opining that the authority to stop a motorist for a traffic violation circumscribed the officer's authority to ask questions about matters only related to the reason for the stop, absent probable cause that other offenses had been committed.[1] We rejected the dissent's argument in *Bonham* because the request to a motorist for consent to search after a traffic stop did not raise a constitutional question, and the statute on its face governs only what occurs during a traffic stop. Now, the dissent's reasoning in *Bonham* reappears in the majority opinion and is applied to the factual context of a request for consent to search being made during the traffic stop. By adopting that reasoning, the majority *sub silentio* overrules our holdings in *Bonham* and in *Allen*.

Thus, the inquiry must be made anew, "Does the policy of the statute *as intended by the legislature* require the majority's conclusion?" Relying on the holding in *Porter* does not answer the question, because making a request to search does not implicate constitutional guarantees in the way that a search does. A "search," such as what occurred in *Porter*, involves the invasion of a person's privacy interests. *State v. Owens*, 302 Or 196, 206, 729 P2d 524 (1986). Defendant's

---

[1] As authority for its position in *Bonham*, the dissenting members relied on the holding in *State v. Porter*. However, their reliance was misplaced, because they failed to recognize that the facts in *Porter* implicated constitutional issues. That distinction is important because, had the *Porter* court upheld the officer's search without probable cause under the statute, it would have run afoul of the constitutional prohibitions against unlawful searches and seizures. The legislature could not have intended that result.

privacy interests were not invaded by Kelly's questions. Police officers may approach private citizens at any time and ask those kinds of questions without implicating any constitutional guarantees or invading privacy interests. *State v. Holmes*, 311 Or 400, 409, 813 P2d 28 (1991); *see also State v. Kennedy*, 290 Or 493, 624 P2d 99 (1981) (holding that inquiring about whether the defendant was carrying narcotics as he was leaving the terminal building of the Portland International Airport was not a "stop" within the meaning of ORS 131.605 *et seq*, nor did it violate the defendant's constitutional rights).

In *State v. Underhill*, 120 Or App 584, 853 P2d 847, *rev den* 318 Or 26 (1993), we held that an officer's "checking out" of the defendant by asking him for his full name, his date of birth and perhaps his social security number did not constitute a stop under ORS 131.615 or implicate constitutional concerns. We concluded:

> "Thus, even though most citizens would find it beyond 'ordinary social intercourse' to be asked by a stranger for name, date of birth and Social Security number, and would find it objectionable that the inquiries were made, especially with the sole purpose of further investigating the individual, those considerations are not factors in determining whether there has been a seizure. *It is the physical action of the officer that determines that result. Id.* at 588-89 (emphasis supplied).

The questions that Kelly asked defendant could be asked lawfully in the context of any other citizen-police encounter, whether they took place in a suspect's home, on the street, at the police station or in a public place. In addition, the facts of this case do not trigger any other policy concerns such as an unauthorized detention or restraint of liberty.[2] When these facts are juxtaposed with the purpose of

---

[2] In contrast, the holdings in *Farley, Porter* and *Dominguez-Martinez* all implicate constitutional concerns because the facts in those cases constituted unlawful restraints of liberty or as in *Porter*, an unlawful search. The actions of the officers in those cases were inconsistent with the legislative purpose of the statute to confine traffic investigations to conduct other than that which could trigger the full quiver of criminal procedural rights.

the statute (to permit prosecution of traffic violations without furnishing constitutional criminal procedural guarantees), there is no nexus. Because the majority's result does not engage with the purpose of the statute, the majority has, in effect, created a new exclusionary rule by judicial fiat. Therein lies its error. It may be meritorious to be concerned about the psychological advantage that police may have when they ask questions outside the purview of a traffic investigation during a traffic stop. There also could be disagreement about whether public policy should permit the use of a lawful traffic stop as a springboard to inquire about matters such as possession of controlled substances or firearms. However, those are legislative concerns, and our authority is restricted to carrying out the legislative purpose for *this statute*. We are not authorized to insert into a statute what has been omitted. ORS 174.010. That is only for the legislature to do.

For that reason, I dissent.