Argued and submitted March 4, ballot titles certified June 18, 1998

Gary M. CARLSON,
*Petitioner,*

*v.*

Hardy MYERS,
Attorney General
of the State of Oregon,
*Respondent,*

*and*

Robert D. DAVIS,
Elli Work and Matt Devore,
*Intervenors.*

(SC S44806 (Initiative No. 58))
(SC S44808 (Initiative No. 59))
(SC S44818 (Initiative No. 60))
(SC S44830 (Initiative No. 64))
(SC S44909 (Initiative No. 67))
(Cases consolidated for argument and opinion)

959 P2d 31

James E. Mountain, Jr., of Harrang Long Gary Rudnick PC, Salem, argued the cause on behalf of petitioner. With him on the petitions was Brendan C. Dunn.

Philip Schradle, Assistant Attorney General, Salem, argued the cause on behalf of respondent. With him on the answering memoranda were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

James S. Coon, of Swanson, Thomas & Coon, Portland, argued the cause and filed memoranda on behalf of intervenors.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Durham, Kulongoski, and Leeson, Justices.*

KULONGOSKI, J.

Durham, J., concurred and filed an opinion.

---

* Graber, J., resigned March 31, 1998, and did not participate in the decision of this case.

## KULONGOSKI, J.

This original proceeding consolidates five separate ballot title challenges to the Attorney General's certified ballot titles for proposed initiatives 58, 59, 60, 64, and 67.[1] Petitioner is an elector who, in a timely manner, submitted written comments about the Attorney General's draft ballot titles for each proposed measure. ORS 250.067(1). Therefore, he is entitled to seek modification of the ballot titles in this court. ORS 250.085(2). We review the Attorney General's certified ballot titles for substantial compliance with the requirements of ORS 250.035. ORS 250.085(5).

Petitioner challenges the caption, result statements, and summary of each of the five certified ballot titles, arguing that the ballot titles are misleading and inaccurate and, therefore, fail to comply with the requirements of ORS 250.035. Petitioner also challenges the ballot titles for proposed initiatives 59, 60, 64, and 67 on the ground that each of the titles impermissibly resembles a previously filed ballot title. ORS 250.035(6). Petitioner asserts that, because of the

---

[1] The chart below summarizes the effects of each of the five proposed initiatives:

| Initiative Number | 58 | 59 | 60 | 64 | 67 |
|---|---|---|---|---|---|
| Same Corporate/Personal Tax Rates | x | x | | x | x |
| Corporate Kicker Credit Percentage not greater than Personal Kicker Refund Percentage | x | x | x | x | x |
| Appropriation (see key below) | '97-'99: 1 '99-2001: 2 | | 1 | '97-'99 1 '99-2001: 3 | '97-'99: 1 '99-2001: 4 |
| Reduction of Maximum Personal Income Tax Rate from 9% to 8.85% | | x | | x | x |

Appropriation key:

1  To school districts for textbooks or capital improvements.

2  One-half to school districts for learning enhancement and one-half to counties for crime prevention.

3  To school districts for learning enhancement.

4  One-half to school districts for learning enhancement and one-half to counties for prevention of criminal involvement by youth.

similarities, this court should not certify ballot titles for those proposed initiatives.

For the reasons that follow, we hold that the ballot title certified by the Attorney General for each of the five measures substantially complies with the requirements of ORS 250.035. We reject petitioner's argument that the court should not certify a ballot title for proposed initiatives 59, 60, 64, and 67. We certify the Attorney General's ballot titles for proposed initiatives 58, 59, 60, 64, and 67.

## Proposed Initiative 58

Proposed initiative 58, entitled the "Oregon Taxpayer Fairness Act," would equalize corporate income and excise tax rates and personal income tax rates. It also would require that the percentage amount of excess revenues credited to corporate income and excise taxpayers be no greater than the percentage amount of excess revenues refunded to personal income taxpayers. Proposed initiative 58 would distribute any increased revenues in the 1997-99 biennium to school districts for textbooks or capital improvements. For the 1999-2001 biennium, it would distribute one-half of any increased revenues to counties for crime-prevention services and one-half to school districts for learning enhancements in the classroom.

Pursuant to ORS 250.067(2), the Attorney General certified the following ballot title for proposed initiative 58:

"REQUIRES EQUAL CORPORATE INCOME/
EXCISE AND PERSONAL INCOME TAX RATES

"RESULT OF 'YES' VOTE:   'Yes' vote requires state's corporate income/excise tax rates to equal personal income tax rates.

"RESULT OF 'NO' VOTE:   'No' vote retains state's corporate income/excise tax rates separate from personal income tax rates.

"SUMMARY:   Current law does not link corporate income/excise tax rates to personal income tax rates. Measure requires state's corporate income/excise tax rates to equal state's personal income tax rates. Current law also establishes separate excess revenue refunds for corporate

income/excise taxpayers and personal income taxpayers when revenues received exceed certain estimates. Measure limits corporate income/excise taxpayers' refund rate to personal income taxpayers' refund rate for same biennium. Distributes certain increased revenues to counties for crime prevention services and to school districts."

## *Proposed Initiative 59*

Proposed initiative 59, entitled the "Oregon Tax Reduction and Equalization Act," would reduce the maximum personal income tax rate from 9 percent to 8.85 percent and equalize corporate income and excise tax rates and personal income tax rates. It also would require that the percentage amount of excess revenues credited to corporate income and excise taxpayers be no greater than the percentage amount of excess revenues refunded to personal income taxpayers.

Pursuant to ORS 250.067(2), the Attorney General certified the following ballot title for proposed initiative 59:

"REDUCES MAXIMUM INCOME TAX RATE;
EQUALIZES PERSONAL/CORPORATE TAX RATES

"RESULT OF 'YES' VOTE:   'Yes' vote reduces maximum personal income tax rate and equalizes certain personal/corporate tax rates.

"RESULT OF 'NO' VOTE:   'No' vote retains current personal income tax rate and retains separate personal/corporate tax rates.

"SUMMARY:   Current state law does not link corporate income/excise tax rates to personal income tax rates. Measure reduces state's maximum personal income tax rate from 9% to 8.85% and requires state's corporate income/excise tax rates to equal state's personal income tax rates. Current law also establishes separate excess revenue refunds for corporate income/excise taxpayers and personal income taxpayers when revenues exceed certain estimates. Measure limits corporate income/excise taxpayers' refund rate to personal income taxpayers' refund rate for same biennium."

## Proposed Initiative 60

Proposed initiative 60, entitled the "Fair Taxpayer Refunds Act," is somewhat simpler. It would require that the percentage amount of excess revenues credited to corporate income and excise taxpayers be no greater than the percentage amount of excess revenues refunded to personal income taxpayers. Proposed initiative 60 would distribute any increased revenues to school districts for textbooks or capital improvements.

Pursuant to ORS 250.067(2), the Attorney General certified the following ballot title for proposed initiative 60:

"LIMITS CORPORATE TAXPAYERS' EXCESS REVENUE ('SURPLUS KICKER') REFUND RATE

"RESULT OF 'YES' VOTE: 'Yes' vote limits corporate taxpayers' excess revenue refund rate to personal income taxpayers' refund rate.

"RESULT OF 'NO' VOTE: 'No' vote retains separate excess revenue refund rates for corporate taxpayers and personal income taxpayers.

"SUMMARY: Current state law establishes separate excess revenue determinations and separate excess revenue refund rates for corporate income/excise taxpayers and personal income taxpayers. Such 'surplus kicker' refunds are required when revenues received exceed estimates by two percent. Measure limits corporate income/excise taxpayers' refund rate (provided as a tax credit) to personal income taxpayers' refund rate during same biennium. Limitation first applies to 'surplus kicker' refunds in 1999-2001 biennium. Measure distributes any increased revenues to school districts for textbooks or capital improvements."

## Proposed Initiative 64

Proposed initiative 64, entitled the "Fair Tax Equalization Act," would reduce the maximum personal income tax rate from 9 percent to 8.85 percent and would equalize corporate income and excise tax rates and personal income tax rates. The measure also would require that the percentage amount of excess revenues credited to corporate income and excise taxpayers be no greater than the percentage amount of

excess revenues refunded to personal income taxpayers. Proposed initiative 64 would distribute any increased revenues to school districts as follows: in the 1997-99 biennium, for textbooks or capital improvements; in the 1999-2001 biennium, for learning enhancement in the classroom.

Pursuant to ORS 250.067(2), the Attorney General certified the following ballot title for proposed initiative 64:

"REDUCES MAXIMUM INCOME TAX RATE;
EQUALIZES PERSONAL/CORPORATE TAX RATES

"RESULT OF 'YES' VOTE: 'Yes' vote reduces maximum personal income tax rate and equalizes certain corporate/personal tax rates.

"RESULT OF 'NO' VOTE: 'No' vote retains current personal income tax rates and retains separate personal/corporate tax rates.

"SUMMARY: Current state law does not link corporate income/excise tax rates to personal income tax rates. Measure reduces state's maximum personal income tax rate and requires state's corporate income/excise tax rates to equal state's personal income tax rates. Current law also establishes separate excess revenue refunds for corporate income/excise taxpayers and personal income taxpayers when revenues received exceed certain estimates. Measure limits corporate income/excise taxpayers' refund rate to personal income taxpayers' refund rate for same biennium. Distributes any increased revenues to schools."

*Proposed Initiative 67*

Proposed initiative 67, entitled the "Fair Tax and Tax Relief Act," would reduce the maximum personal income tax rate from 9 percent to 8.85 percent and would equalize corporate income and excise tax rates and personal income tax rates. The measure also would require that the percentage amount of excess revenues credited to corporate income and excise taxpayers be no greater than the percentage amount of excess revenues refunded to personal income taxpayers. Proposed initiative 67 would distribute any increased revenues as follows: one-half to counties for crime-prevention activities; one-half to school districts for learning enhancement in the classroom.

⋅ Pursuant to ORS 250.067(2), the Attorney General certified the following ballot title for proposed initiative 67:

"REDUCES MAXIMUM INCOME TAX RATE;
EQUALIZES PERSONAL/CORPORATE TAX RATES

"RESULT OF 'YES' VOTE: 'Yes' vote reduces maximum personal income tax rate and equalizes certain corporate/personal tax rates.

"RESULT OF 'NO' VOTE: 'No' vote retains current personal income tax rates and retains separate personal/corporate tax rates.

"SUMMARY: Current state law does not link corporate income/excise tax rates to personal income tax rates. Measure reduces state's maximum personal income tax rate and requires state's corporate income/excise tax rates to equal state's personal income tax rates. Current law also establishes separate excess revenue refunds for corporate income/excise taxpayers and personal income taxpayers when revenues received exceed certain estimates. Measure limits corporate income/excise taxpayers' refund rate to personal income taxpayers' refund rate for same biennium. Distributes increased revenues to schools/counties."

As noted, petitioner challenges the caption, result statements, and summary for each of the five ballot titles certified by the Attorney General. Petitioner argues that the ballot titles are misleading and inaccurate and, therefore, fail to comply substantially with the requirements of ORS 250.035(2) to (5). After review, we are not persuaded by those arguments.

■    ORS 250.035(2)(a) requires that the ballot title for a state initiative measure contain a "caption of not more than 10 words that reasonably identifies the subject matter" of the proposed measure. The certified ballot titles for proposed initiatives 58, 59, 60, 64, and 67 each include a caption of not more than 10 words. Each caption "reasonably identifies" the subject matter of its respective proposed initiative.

ORS 250.035(2)(b) and (c) require that the ballot title for a state initiative measure contain "simple and understandable statements of not more than 15 words that describe the result if the state measure" is approved and the

result if the measure is rejected. The result statements must be written, if possible, in such a way that the language of the "yes" and "no" statements is "parallel." ORS 250.035(3); *Mannix v. Kulongoski*, 323 Or 485, 494, 918 P2d 839 (1996). In addition, the "yes" and "no" statements must correspond, respectively, to affirmative and negative voter responses to the proposed measure. ORS 250.035(4) and (5). The certified ballot titles for proposed initiatives 58, 59, 60, 64, and 67 each contain "yes" and "no" result statements of not more than 15 words, written so that the language of the "yes" and "no" statements for each measure is "parallel," and so that the "yes" and "no" statements correspond, respectively, to affirmative and negative voter responses to each proposed initiative measure.

Finally, ORS 250.035(2)(d) requires that the ballot title for a state initiative measure include a "concise and impartial statement of not more than 85 words summarizing the measure and its major effect." The certified ballot titles for proposed initiatives 58, 59, 60, 64, and 67 contain such a summary of not more than 85 words, which provide an impartial statement of the major effect of the corresponding proposed initiative.

Based on the foregoing analysis, we conclude that the ballot titles certified by the Attorney General for the five proposed initiatives substantially comply with the requirements of ORS 250.035(2) to (5). ORS 250.085.

Petitioner also contends that, "[b]ecause of the resemblance between Initiative Nos. 58, 59, 60, 64, and 67, any formally sufficient ballot titles for the measures necessarily will resemble the other ballot titles" and that those titles therefore fail to comply with ORS 250.035(6). ORS 250.035(6) provides:

> "To avoid confusion, a ballot title shall not resemble any title previously filed for a measure to be submitted at that election."

Petitioner asserts that ORS 250.035(6) "prohibits outright the certification of any ballot title that 'resembles' any title previously filed for a measure" and that, because of that prohibition, this court should decline to certify ballot titles for

proposed initiatives 59, 60, 64, and 67, and order that the proposed initiatives not be circulated.

In order to resolve the issues presented by petitioner's arguments under ORS 250.035(6), we must interpret that statute. The current wording of the statute was adopted by the legislature in 1995,[2] and its interpretation is a matter of first impression.

In interpreting a statute, this court's task is to discern the intent of the legislature. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). The starting point for interpreting the statute is its text and context. *Id.* at 610-11. Words of common usage should be given their "plain, natural and ordinary meaning." *Id.* at 611. Context includes earlier versions of the same statute. *Krieger v. Just*, 319 Or 328, 336, 876 P2d 754 (1994).

The wording of ORS 250.035(6) indicates that any prohibition, unconditional or otherwise, is relevant only if a certified ballot title "resembles" any previously filed ballot title. ORS 250.035(6). "Resemble" means "to be like or similar," so as to suggest another or to give the appearance of another. *Webster's Third New Int'l Dictionary*, 1930 (unabridged ed 1993). Also, by its terms, ORS 250.035(6) prohibits certification of only a *ballot title* that resembles a previously filed ballot title.

We reject petitioner's argument with regard to the certified ballot titles for proposed initiatives 60 and 67, because those certified ballot titles do not "resemble" each other, nor do they "resemble" the certified ballot title for proposed initiative 58. Because the certified ballot titles for proposed initiatives 60 and 67 resemble neither each other nor the certified ballot title for proposed initiative 58, the standard set by ORS 250.035(6) is not implicated with respect to those proposed initiatives.

The ballot titles for proposed initiatives 59, 64, and 67 all closely resemble each other. Indeed, the three ballot titles are nearly identical: all three captions are identical, the "yes" and "no" results statements are identical for each of the

[2] Or Laws 1995, ch 534, § 1.

three proposed initiatives, and there are only minor differences between the summaries. We conclude that there is a strong resemblance among the Attorney General's certified ballot titles for proposed initiatives 59, 64, and 67. Because of that resemblance, the court must decide whether, as petitioner contends, ORS 250.035(6) "prohibits outright the certification of any ballot title that 'resembles' any title previously filed for a measure." That requires us to further interpret ORS 250.035(6).

■ The interpretative challenge with respect to ORS 250.035(6) lies in determining the meaning of the phrase "[t]o avoid confusion." If the statute were written without that prefatory phrase, it would be clear that the legislature intended a complete ban on the certification of a ballot title that resembled any previously filed ballot title for a measure to be submitted at the same election. ORS 250.035(6). However, in interpreting a statute, this court should neither insert what has been omitted by the legislature nor omit what the legislature has inserted. *Michels v. Hodges*, 326 Or 538, 544, 956 P2d 184 (1998); *PGE*, 317 Or at 611 (citing ORS 174.010). The phrase "[t]o avoid confusion" could be interpreted as stating a legislative object or purpose. With that interpretation, the complete statutory text of ORS 250.035(6) would indicate that, in order to accomplish the legislative objective of avoiding confusion, the legislature has forbidden unconditionally the certification of any ballot title that resembles a previously certified title.

■ Alternatively, the phrase "[t]o avoid confusion" could be read as language of qualification, making conditional the ban on certification of a ballot title that resembles a previously filed ballot title. Under that interpretation, the statute would prohibit resemblance between or among ballot titles where such resemblance would cause voter confusion. The context of ORS 250.035(6) supports the latter interpretation. *Former* ORS 250.035(2), the predecessor statute to ORS 250.035(6), expressed such a conditional prohibition on the certification of a ballot title that resembled a previously certified ballot title:

> "The ballot title shall not resemble, *so far as probably to create confusion*, any title previously filed for a measure to be submitted at that election." (Emphasis added.)

*Former* ORS 250.035(2) was clearly conditional, and this court interpreted it accordingly. In *Rooney v. Kulongoski (Elections Division #13)*, 322 Or 15, 902 P2d 1143 (1995), this court determined that *former* ORS 250.035(2) allowed certification of two similar ballot titles if such certification did not create a risk of voter confusion (indeed, where proposed initiative measures are very similar or nearly identical, there may be a great risk of voter confusion created by the certification of *different* ballot titles). 322 Or at 46, 48, 51.

■    In the construction of amendatory acts, such as the one under consideration here, it is presumed that material changes in the language of the statute create material changes in meaning. At the same time, it is presumed that such changes in meaning do not go further than is expressly declared or necessarily implied. *Fifth Avenue Corp. v. Washington Co.*, 282 Or 591, 597-98, 581 P2d 50 (1978). The legislature may have meant ORS 250.035(6) to materially change the meaning of the words in *former* ORS 250.035(2); however, because the wording of ORS 250.035(6) is ambiguous, it is not possible to determine from an examination of the text and context of the new statute either the nature or the extent of the intended change, if any.

■    When the intent of the legislature is not clear after an examination of the text and context of a statute, the court next considers the legislative history of the statute in order to inform the court's inquiry into legislative intent. *PGE*, 317 Or at 611-12. Unfortunately, there is no legislative history that sheds light on the legislature's intent regarding ORS 250.035(6).

■    Where no legislative history exists, this court will resort to general maxims of statutory construction, *PGE*, 317 Or at 612, including the maxim that where no legislative history exists the court will attempt to determine how the legislature would have intended the statute be applied, had it considered the issue. *Westwood Homeowners Assn., Inc. v. Lane County*, 318 Or 146, 158, 864 P2d 350 (1993) (citing *PGE*, 317 Or at 612), *adhered to as modified* 318 Or 327, 866 P2d 463 (1994).

Were we to read ORS 250.035(6) as an unconditional ban on the certification of ballot titles that resemble each

other, as petitioner urges us to do, we would have to conclude that the legislature intended to force this court to resolve a conflict between two irreconcilable results. On the one hand, certification by this court of the Attorney General's certified ballot titles for proposed initiatives 59, 64, and 67 would meet the directive to certify accurate ballot titles for proposed initiatives, as required by ORS 250.085(5). On the other hand, that same act of certification would violate the supposed unconditional ban on the certification of a ballot title that resembles any previously filed ballot title for a proposed initiative to be submitted at the same election. There is no way to avoid the dilemma. Where the texts of two or more proposed initiative measures are very similar or nearly identical, no effort to eliminate the prohibited "resemblance" between accurate ballot titles through the use of synonyms and other linguistic devices can overcome the problem, because such efforts will simply produce "resemblance" in a slightly different form. The English language is flexible, but not so flexible as to permit the construction of truly different ballot titles that could at once both comply with ORS 250.085(5) and still avoid resemblance to the point that they also complied with ORS 250.085(6).

■ The correct analytical route for this court is to avoid the statutory interpretation that would produce irreconcilable conflict and, instead, to construe the statute according to the probable intention of the legislature, had it considered the issue. *Westwood Homeowners Assn.*, 318 Or at 158; *PGE*, 317 Or at 612. Had the legislature actually addressed this problem, in all likelihood it would have authorized this court to certify accurate ballot titles, such as those certified by the Attorney General for proposed initiative measures 59, 64, and 67, even if those ballot titles resembled an earlier certified ballot title. We thus conclude that interpreting ORS 250.035(6) as a conditional ban on the certification of a ballot title that resembles a previously filed ballot title is what the legislature would have intended. This interpretation does the least violence to the interests of the legislature and the voters, in that it tends to facilitate an honest, clear, and reasonably simple procedure for certifying an initiative petition ballot title.

■     We hold that ORS 250.035(6) does not prohibit unconditionally all resemblance between or among ballot titles. Rather, the statute conditionally prohibits resemblance between or among ballot titles only where such resemblance would cause voter confusion.[3] In other words, similar or identical ballot titles are appropriate when their similarities accurately reflect similarities between or among the measures under consideration. As this court held in *Rooney*, when proposed initiative measures are themselves very similar or nearly identical, there may be "too great a risk" of voter confusion created by the certification of *different* ballot titles. 322 Or at 46, 48, 51. We reject petitioner's argument that the Attorney General's certified ballot titles for initiatives 59, 64, and 67 should be invalidated and those measures not circulated.

We certify the Attorney General's ballot titles for initiatives 58, 59, 60, 64, and 67.

Ballot titles certified. This decision shall become effective in accordance with ORAP 11.30(10).

**DURHAM, J.,** concurring.

I write separately because I agree with the majority's decision to certify the Attorney General's ballot titles in these cases, but I do not agree with all of its analysis of the interpretive problems posed by ORS 250.035(6).[1] I join in the majority's suggestion that "[t]he legislature should revisit ORS 250.035(6) at its earliest opportunity," 327 Or at 227 n 3, and offer these additional comments in the hope that they will assist the legislature in understanding the complexities of the problem that ORS 250.035(6) creates.

---

[3] The legislature should revisit ORS 250.035(6) at its earliest opportunity. This case illustrates clearly that the Attorney General and this court cannot always satisfy the competing policies in ORS 250.035 and ORS 250.085(5), as those statutes currently are written. The Attorney General and the court both would benefit from clear legislative guidance as to what must occur when the text of two or more ballot measures is nearly identical and, as a consequence, the respective ballot titles resemble each other.

[1] This concurring opinion comments on the majority's analysis of the "resemblance" problems posed by the Attorney General's ballot titles for initiatives 59, 64, and 67. I join fully in the court's reasoning in certifying the Attorney General's ballot titles for initiatives 58 and 60.

ORS 250.035(6) provides: "To avoid confusion, a ballot title shall not resemble any title previously filed for a measure to be submitted at that election."[2] That statute states one of several requirements that govern the preparation of a ballot title by the Attorney General pursuant to ORS 250.065, ORS 250.067, and ORS 250.075.

Furthermore, in ballot title review proceedings under ORS 250.085, this court must apply those requirements in two distinct contexts: (1) in *reviewing* the Attorney General's ballot title for "substantial compliance with the requirements of ORS 250.035"; and (2) in *certifying* a ballot title that substantially complies with ORS 250.035 to the Secretary of State. ORS 250.085(5).

The judicial review procedure in ORS 250.085 carries two clear consequences. First, if this court determines on review that the Attorney General's ballot title does not comply substantially with any of the requirements stated in ORS 250.035, including the requirement in subsection (6) that a

---

[2] I raise, but do not attempt to resolve, the question of what the term "confusion" means in this context. The answer is not clear. The certification of markedly different ballot titles for multiple, nearly identical ballot measures has the potential for causing voter confusion by suggesting that the measures are very different when, in fact, they are not. This court noted that potential for voter confusion in *Rooney v. Kulongoski (Elections Division #13)*, 322 Or 15, 902 P2d 1143 (1995). However, the certification of multiple ballot titles that closely resemble each other carries at least an equal potential for voter confusion because that practice deprives the voters of their only practical means for discriminating between multiple, similar ballot measures. *Rooney* did not address that potential source of voter confusion. ORS 250.035(6) focuses on the risk of voter confusion resulting from the use of similar ballot titles, not different ones, but the majority sidesteps that focus in interpreting that statute.

A separate question concerns *whose* potential confusion is at stake. It is easy to conclude that the legislature was concerned about the potential confusion of voters. However, in drafting ORS 250.035(6), the legislature also may have endeavored to protect the distinct interests of petition signers, petition circulators, parties who seek to challenge ballot titles, and election officials in avoiding "confusion" in contexts other than simply voting on a ballot measure.

Finally, the meaning of the term "resemble" in this context is far from clear. Like beauty, it is a quality that may exist only in the eye of the beholder. Because that term calls for what can only be fairly described as a subjective determination, it invites litigation and inevitably will produce the attendant negative consequences of delay in the initiative process and an increased workload for the Department of Justice and this court. This court need not resolve what "resemble" means in this case, because the parties agree that the ballot titles for initiatives 59, 64, and 67 resemble the ballot title filed for initiative 58 within the meaning of ORS 250.035(6).

ballot title shall not "resemble" another ballot title, the court is required to refuse to certify the Attorney General's ballot title. I refer to this process as the court's "review" function. Second, if this court declines to certify the Attorney General's ballot title, ORS 250.085(5) requires the court to draft and certify a ballot title that does comply substantially with ORS 250.035. I refer to this process as the court's "drafting" function.

Petitioner argues that the Attorney General's ballot titles for initiatives 59, 64, and 67 "resemble" the ballot title approved for initiative 58, in violation of ORS 250.035(6), and urges the court, in carrying out its review function, to refuse to certify the Attorney General's ballot titles for those initiative measures because of that alleged defect. The Attorney General concedes that the ballot titles for initiatives 59, 64, and 67 do resemble the ballot title for·initiative 58. It would be impossible to argue otherwise, because those ballot titles are virtual duplicates of each other. However, the Attorney General argues that the statute forbids certification of similar ballot titles if, but only if, the resulting duplication of ballot titles would cause voter confusion. Citing this court's reasoning in *Rooney v. Kulongoski (Elections Division #13)*, 322 Or 15, 902 P2d 1143 (1995), the Attorney General claims that the certification of similar ballot titles here will reduce, not increase, the risk of voter confusion. Those competing arguments require the court to interpret ORS 250.035(6).

The majority concludes that the statutory text is ambiguous because the introductory phrase, "[t]o avoid confusion," can be read plausibly either as a statement of purpose that does not qualify the balance of the sentence or as a statement of a condition that must be shown to exist before the balance of the sentence becomes operative. I do not agree that the text is ambiguous. A straightforward reading of the text indicates that the introductory phrase, "[t]o avoid confusion," describes the purpose that the legislature had in mind in drafting the statute. That phrase in no sense qualifies the operation of the prohibition on the certification of ballot titles that resemble each other that is expressed in the balance of the sentence.

We cannot discern a statute's meaning by examining its text alone. The majority correctly acknowledges that we must examine the statutory text *in its context*, which includes prior versions of the same statute. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993); *Kreiger v. Just*, 319 Or 328, 336, 876 P2d 754 (1994). The majority attempts to examine the prior version of ORS 250.035(6) but, as the following discussion indicates, its examination is erroneous.

ORS 250.035(6) was enacted in 1995. Or Laws 1995, ch 534, § 1. The statute in effect at the time of the amendment, ORS 250.035(2) (1993), stated:

> "The ballot title shall not resemble, so far as probably to create confusion, any title previously filed for a measure to be submitted at that election."

The former statute expressed a qualified prohibition. It forbade the certification of a ballot title that resembled another ballot title already on file if the later ballot title probably would cause confusion. It required the Attorney General, and this court on review, to determine the probability for confusion resulting from the use of similar ballot titles, and prohibited the use of similar ballot titles only if doing so probably would create confusion. *Rooney*, 322 Or at 43-44.

The 1995 amendment enacted a new and substantively different policy choice. The majority commits an analytical error in refusing to acknowledge that different choice and in labeling the 1995 amendment as "ambiguous." The 1995 amendment unconditionally prohibits the certification of a ballot title that resembles another filed ballot title. When the legislature makes a substantive alteration in a statute, this court assumes that the legislature intends to effect a change in the existing statutory policy. *See Jones v. General Motors Corp.*, 325 Or 404, 414-15 n 6, 939 P2d 608 (1997) (noting principle);[3] *Fifth Avenue Corp. v. Washington Co.*, 282 Or 591, 597, 581 P2d 50 (1978) (in the construction of amendatory acts, the court assumes that "material changes in the language create material changes in meaning"). The majority

---

[3] In contrast with the amendment at issue in *Jones*, the 1995 amendment to ORS 250.035(6) materially altered the policy set forth in its statutory predecessor.

refers to that legal principle, but refuses, without explanation, to follow it.[4]

The majority also does not explain what is confusing about the legislature's introduction of the 1995 amendment with a phrase that indicates the legislature's purpose, "[t]o avoid confusion." The words that follow that phrase express a clear rule prohibiting "resemblance" between ballot titles. Nothing in the text of the introductory phrase or its placement within the statute casts a doubt on the meaning of that statutory prohibition. Under the majority's approach, the legislature now must be concerned that combining a clear statutory requirement with a clear statement of legislative purpose will render the resulting statute "ambiguous." In my view, that approach imposes an unnecessary constraint on the legislative drafting process.

The majority concludes that its comparison of ORS 250.035(6) with its statutory predecessor does not clarify the supposed ambiguity that arises from the phrase "[t]o avoid confusion" in the current statute. As a consequence, the majority proceeds to examine legislative history. Finding no assistance there, the majority moves to a consideration of "maxims" of statutory construction. At that stage, the court purports to speculate about how the legislature might have

---

[4] To be accurate, "principles," "rules," and "maxims" of statutory interpretation are not law unless enacted. Those terms describe a host of common sense approaches used by judges to discover a statute's true meaning in the face of textual ambiguity, inconsistency and contradiction.

"Each of these common sense approaches fits some cases but not others, each has 'exceptions' and opposite-and-equal counterparts, and each causes more harm than it is worth if it is not cheerfully ignored whenever it is an obstacle to understanding what the legislature enacted." *Davis v. Wasco IED*, 286 Or 261, 274, 593 P2d 1152 (1979) (Linde, J., concurring) (footnote omitted).

The mistaken tendency of some judges and lawyers to treat those aids to interpretation as enacted law is due in part to this court's announcement in 1993 in *PGE* that it would follow a template for statutory interpretation. But for this court's announced preference for a methodological approach to interpreting statutes, I would avoid citing interpretive aids in opinions as if they are binding law. They are not. Professor Sinclair makes a similar helpful observation:

"[W]e [should not] expect a general theory of statutory interpretation to be very detailed. The principle of legislative supremacy * * * requires top-down, Euclidean reasoning, and with it, a resort to legislative intent where necessary for the application of underdeterminate statutes. Within that boundary, we should not expect—and nor do we find—strict limitations on method." M.B.W. Sinclair, *Statutory Reasoning*, 46 Drake L Rev 299, 382 (1997).

dealt with the instant problem, had it addressed the question. For the following reasons, that analysis is flawed.

A statute's context also includes other related statutes. *PGE*, 317 Or at 611. However, the majority fails to consider another aspect of the statutory context of ORS 250.035(6), *i.e.*, other statutes that relate to the same subject.[5] It is legal error for the majority to fail to consider all the relevant statutes in deciding whether they can be read together with ORS 250.035(6) in order to create a workable, harmonious construction. In *Davis v. Wasco IED*, 286 Or 261, 266-67, 593 P2d 1152 (1979), in quoting C. Dallas Sands, 2A Sutherland Statutory Construction § 46.05, 56 (4th ed 1973), this court said:

> "A statute is passed as a whole and not in parts or sections and is animated by one general purpose and intent. Consequently, each part or section should be construed in connection with every other part or section so as to produce a harmonious whole. Thus it is not proper to confine interpretation to the one section to be construed."

When it considers statutes in context, the court is obligated to "utilize[ ] rules of construction that bear directly on the interpretation of the statutory provision in context." *PGE*, 317 at 611. As noted in *PGE*, we derive those rules of construction from both statutes and case law. *Ibid.*

ORS 174.010 provides that "where there are several provisions or particulars such construction is, *if possible*, to

---

[5] This court often refers to *PGE* as a statement of its *template* for statutory interpretation. *Sea-Air Handling Services, Inc. v. Reed*, 327 Or 25, 30, 956 P2d 953 (1998); *Pollin v. Dept. of Rev.*, 326 Or 427, 431, 952 P2d 537 (1998); *Foltz v. State Farm Mutual Auto. Ins. Co.*, 326 Or 294, 299, 952 P2d 1012 (1998). That term suggests that this court believes that the methodical application of a system of well considered rules, in the context of statutory construction, is a worthy objective. I fully agree. However, by citing and then disregarding the analysis called for by *PGE*, the majority tends to defeat the predictability of both the *PGE* methodology and our statutory interpretations, and lends supporting evidence to the frank but all-too-true empirical observation of Professors Hart and Sacks:

"Do not expect anybody's theory of statutory interpretation, whether it is your own or somebody else's, to be an accurate statement of what courts actually do with statutes. The hard truth of the matter is that American courts have no intelligible, generally accepted, and consistently applied theory of statutory interpretation." Henry M. Hart, Jr. and Albert M. Sacks, *The Legal Process: Basic Problems in the Making and Application of Law*, 1169 (William N. Eskridge, Jr. & Phillip P. Frickey eds., 2d ed 1994).

be adopted as will give effect to all." (Emphasis added.) Case law also supplies several rules of construction of statutes in context that are relevant here. In *Fox v. Galloway*, 174 Or 339, 347, 148 P2d 922 (1944), this court said:

> "If the language is plain and unambiguous, if it can be given but one meaning, *and that meaning does not lead to an impossibility or an absurdity such as the legislature could not be supposed to have intended,* the court must give effect to that meaning if constitutional, even though the result may be, in the court's opinion, harsh, unjust or mistaken in policy[.]

> "*When, however, a literal application of the language produces an absurd or unreasonable result, it is the duty of the court to construe the act, if possible, so that it is a reasonable and workable law and not inconsistent with the general policy of the legislature*[.]" (Citations omitted; emphasis supplied.)

This court has relied repeatedly on that statement in *Fox* to reject proposed statutory constructions that, although supported by a literal reading of statutory text, produced unworkable results in actual application. *See Johnson v. Star Machinery Co.*, 270 Or 694, 704-09, 530 P2d 53 (1974) (court construed statute of repose governing "negligent injury" to apply as well to a strict product liability claim); *State v. Irving*, 268 Or 204, 206-07, 520 P2d 354 (1974) (court rejected a literal interpretation of a criminal procedural statute because it produced a "patently unreasonable result"); *Beck v. Aichele*, 258 Or 245, 249, 482 P2d 184 (1971) (court rejected a proposed statutory construction that would create a monopoly because, "[i]n light of our everyday knowledge and common sense, this interpretation is absurd").

Another relevant rule of construction of statutes in context appears in *Wright v. Blue Mt. Hospital Dist.*, 214 Or 141, 147, 328 P2d 314 (1958):

> "[It is a] well-established rule of statutory construction that when one construction will make a statute void for conflict with the constitution, and another will render it valid, the latter will be adopted though the former at first view is otherwise the more natural interpretation of the language."

I turn next to the relevant contextual statutes. ORS 250.065(3) and ORS 250.067(2) require the Attorney General to prepare and certify a ballot title. ORS 250.035(2) states some of the requirements for a ballot title. The "caption" must reasonably identify a measure's subject matter within 10 words. ORS 250.035(2)(a). The "yes" and "no" vote result statements must convey a "simple and understandable statement of not more than 15 words that describes the result if the state measure" is approved or rejected. ORS 250.035(2)(b) and (c). The Attorney General must draft the result statements "so that, to the extent practical, the language of the two statements is parallel," ORS 250.035(3), and so that an affirmative or negative response to the statements corresponds to an affirmative or negative vote, respectively, on the state measure. ORS 250.035(4) and (5). The prohibition on "resemblance" between ballot titles in ORS 250.035(6) concludes the list.

The Attorney General contends that, on occasion, the limitations of the English language will prevent compliance with all those statutory requirements. I agree. As this case illustrates, the English language furnishes insufficient vocabulary, grammar, and other means of expression to: (1) construct ballot titles for the closely related initiatives 59, 64, and 67 that comply with ORS 250.035(2) to (5); and, at the same time, (2) eliminate all resemblance between those ballot titles and the ballot title already certified for initiative 58. Compliance with all those statutory requirements in a case such as this is, in a word, impossible.

In determining the legislature's intention in enacting statutes governing the certification of ballot titles, we must bear in mind one irreducible minimum requirement: the drafting process must take place within the context of the English language. The legislature did not intend to require the Attorney General, in carrying out his ballot title drafting function, to comply literally with ORS 250.035(6) if it is not possible to do so because of the limitations of the English language. Neither did the legislature intend to compel this court, in carrying out its review and drafting functions, to carry out such an impossible task. Such a construction of the statute would produce an impractical, unintended result.

Moreover, a literal application of ORS 250.035(6) would mire the court even deeper in the work of the Legislative or Executive Branches. *See Rooney*, 322 Or at 55 (Unis, J., dissenting) (expressing the view that the requirement in ORS 250.085(5), that the court must draft and certify a ballot title that complies with statutory standards, violates the principle of separation of powers embodied in Article III, section 1, of the Oregon Constitution).[6] When the court construes statutes in context and selects between alternative constructions of an uncertain text, it is compelled to choose the interpretation that avoids serious constitutional difficulty. *Tharalson v. State Dept. of Rev.*, 281 Or 9, 13, 573 P2d 298 (1978). That duty requires the court to reject an interpretation of ORS 250.035(6) that would create or exacerbate a separation of powers problem.

The real question here is what to do about the conflict between the requirements in ORS 250.035(2) to (5) and the impossibility of literal compliance, at least in some cases, with the rule against "resemblance" stated in ORS 250.035(6). The answer is complicated by the fact that subsection (6) was adopted *after* the other requirements listed in ORS 250.035(2) to (5). The majority does not consider the effect of that fact. Ordinarily, if the legislature enacts a statutory requirement that conflicts with another earlier-enacted statutory requirement, and the conflict is irreconcilable, the earlier statute must yield to the later statute. *State ex rel Huddleston v. Sawyer*, 324 Or 597, 604-05, 932 P2d 1145 (1997) (repeal by implication is applicable if the repugnancy is plain, unavoidable and irreconcilable); *State v. Shumway*, 291 Or 153, 160, 630 P2d 796 (1981). I conclude that that rule plays no role here because, even under a strict

---

[6] In my view, the separation of powers problem arises not from the requirement that the court must *review* the Attorney General's ballot title, but from the requirement that, if the Attorney General's ballot title is insufficient, the court must *draft a new ballot title* that satisfies statutory requirements and certify it to the Secretary of State. ORS 250.085(5). Parties that desire to assert that that requirement is unlawful and that the court must confine itself to the permissible work of the Judicial Branch must raise that argument in a brief to this court and, perhaps, in comments to the Secretary of State regarding the Attorney General's draft ballot title. *See* ORS 250.085(6) (on review of a ballot title, the court is precluded from considering arguments not raised in comments to the Secretary of State regarding the draft ballot title).

application of ORS 250.035(6), the preparation of multiple ballot titles that bear no resemblance to each other would not be possible in all cases. The repeal by implication of the ballot title requirements described in ORS 250.035(2) to (5) would undermine, not support, the express purpose behind ORS 250.035(6), "[t]o avoid confusion." As the discussion below indicates, we can avoid those unreasonable outcomes, and reconcile the apparent conflict in the statutes, by treating the drafting requirement stated in ORS 250.035(6) as being subject to the linguistic limitations of the English language in which every ballot title must appear. Thus, the rule expressed in *Shumway* is not applicable here, because the conflict between the requirements set forth in ORS 250.035(2) to (6) is not irreconcilable.

The Attorney General's argument suggests that the difficulty in eliminating resemblance between ballot titles arises, not in every ballot title case, but only in those cases in which compliance with ORS 250.035(6) is impossible because of the limitations of the English language. I agree. Accordingly, in order to produce a practical and common sense result, I would recognize that, in the context of similar ballot measures, the legislature intended ORS 250.035(6) to permit only that limited degree of resemblance between multiple ballot titles as is necessary to permit the Attorney General to publish ballot titles in understandable English.

In my view, this court's task in this case is to recognize that a literal application of ORS 250.035(6) would produce an absurd outcome and, following the ordinary rules that apply to the interpretation of statutes in context, to construe that statute and other related statutes together to produce a harmonious, workable result. The problem with ORS 250.035(6) arises not from any ambiguity in its text, as the majority erroneously believes, but from the impracticality of literal compliance with its command. In responding to that interpretive problem, this court must adopt a statutory construction that is both functional and, to the extent possible, faithful to the legislature's goal of prohibiting "resemblance" between ballot titles.

My reading of ORS 250.035(6) correctly interprets that statute in context by giving maximum effect to all relevant statutes, and by avoiding the impossible, absurd and

unworkable result that would flow from a literal application of the text of ORS 250.035(6). That approach keeps faith with ORS 174.010 and the rules of contextual construction described in *Davis* and *Fox*. Finally, my approach avoids any arguable interference with a citizen's right to initiate legislation that might result from declining to certify a ballot title in the name of avoiding resemblance with another ballot title certified at an earlier date.

The analytical approach of this opinion and that of the majority can lead to very different substantive outcomes. Under the majority's approach, the focus of analysis is the supposed ambiguity of the phrase "[t]o avoid confusion." The majority's construction permits the Attorney General to escape the responsibility to comply with ORS 250.035(6) by demonstrating merely that the underlying initiative *measures* are similar. That view permits the Attorney General to certify identical ballot titles for several measures to be considered at the same election. The majority fails to acknowledge that *the legislature drafted ORS 250.035(6) to eliminate the evil that arises from voter confusion due to the certification of ballot titles that closely resemble each other*. That is, if several measures bear the same or similar ballot titles, voters will have no practical way to distinguish between them. The majority adopts a statutory construction that seems to ignore the very sort of voter confusion that ORS 250.035(6) was intended to prevent.

I join in the certification of the Attorney General's ballot titles for initiatives 59, 64, and 67, because I am persuaded that the Attorney General cannot prepare more distinctive ballot titles for those measures, given the limitations of the English language that govern that task. I disagree with the majority's conclusion that the use of similar ballot titles here will not cause voter confusion. Indeed, unless and until the legislature revisits the problems created by ORS 250.035(6), voter confusion from the use of nearly identical ballot titles likely will be the order of the day.

Until the legislature reconsiders ORS 250.035(6), the voting public will have to depend on the Attorney General to prepare distinctive ballot titles that will permit the voters

to distinguish between similar measures. In my view, the legislature has broad power to protect the voting public from confusion of that sort, and it should not hesitate to use it. *See* Or Const, Art IV, § 1(4)(b) (*"Initiative* and referendum measures shall be submitted to the people as provided in this section and by law not inconsistent therewith.").

I concur.