No. 55 December 24, 2025 623

IN THE SUPREME COURT OF THE
STATE OF OREGON

JOSE RAFAEL ARELLANO-SANCHEZ,
*Plaintiff,*

*v.*

Charlotte THRASHER,
Superintendent,
Coffee Creek
Correctional Facility,
*Defendant.*

(SC S072470)

En Banc

Original proceeding in habeas corpus.

Argued and submitted December 18, 2025.

Theodore Erde-Wollheim, Metropolitan Public Defender, Hillsboro, argued the cause and filed the petition, the memorandum in support of the petition, and the reply for plaintiff.

Paul L. Smith, Deputy Solicitor General, Salem, argued the cause and filed the response to the petition for defendant. Also on the brief were Dan Rayfield, Attorney General, and Benjamin Gutman, Interim Deputy Attorney General.

GARRETT, J.

It is hereby ordered that plaintiff immediately be discharged from his illegal imprisonment. Pursuant to ORAP 1.20(5) and notwithstanding ORAP 9.25 and ORAP 14.05 (3)(b), the State Court Administrator shall issue the appellate judgment immediately.

James, J. concurred and filed an opinion, in which Bushong, J., joined.

**GARRETT, J.**

Plaintiff has petitioned for a writ of habeas corpus, requesting that this court exercise its original jurisdiction and order his immediate release from prison. *See* Or Const, Art VII (Amended), § 2 ("[T]he supreme court may, in its own discretion, take original jurisdiction in *** habeas corpus proceedings.").[1] In August 2025, the Oregon Department of Corrections (DOC) released plaintiff from a correctional institution after recalculating his credit for time served and determining that his projected release date had already passed. Thereafter, DOC again recalculated plaintiff's credit for time served, "corrected" the calculation that had resulted in plaintiff's release, and set his projected release for a date in 2027. Acting under color of ORS 144.350, which authorizes DOC to issue an order for the arrest of a person who has "[e]scaped from the supervision, custody or control of the department," DOC then issued an order for plaintiff's arrest and return to custody. Plaintiff was reincarcerated pursuant to that order.[2]

For the reasons explained in this opinion, we conclude that, under the circumstances of this case, ORS 144.350 did not authorize DOC to issue the order for plaintiff's arrest and return. Accordingly, because the cited authority provides no basis for DOC's action, we order that plaintiff immediately be discharged from custody.

FACTUAL AND PROCEDURAL BACKGROUND

The relevant facts are procedural and uncontested. In 2017, plaintiff was convicted of numerous crimes, including first-degree robbery, second-degree assault, and unlawful use of a weapon. Appellate proceedings ensued on grounds not pertinent to our resolution of this case. In 2022, following a remand from the Court of Appeals, plaintiff pleaded

---

[1] *See also* ORS 34.310 (providing that every person who is "imprisoned or otherwise restrained of liberty," with exceptions, "may prosecute a writ of habeas corpus to inquire into the cause of such imprisonment or restraint, and if illegal, to be delivered therefrom").

[2] Although DOC is the entity that released plaintiff and issued the order pursuant to which plaintiff was reincarcerated, defendant is Charlotte Thrasher, the Superintendent of Coffee Creek Correctional Facility. Throughout this opinion, individual state actors are referred to by name and collectively referred to as "the state."

guilty to the two counts that had been remanded to the trial court. He was resentenced to a total term of incarceration of 120 months. That term of incarceration was the result of a 90-month sentence on one count and a 70-month sentence on another count, of which 30 months were to be served consecutively. The judgment ordered those sentences "with credit for time served since [plaintiff's] arrest on November 3, 2016," and stated that "[plaintiff] shall serve the entire 120 months imposed by the Court." DOC initially calculated plaintiff's projected release date to be in November 2026.

In 2025, we issued our decision in *State ex rel Torres-Lopez v. Fahrion*, 373 Or 816, 572 P3d 1045 (*Torres-Lopez I*), *adh'd to as modified on recons*, 374 Or 423, ___ P3d ___ (2025) (*Torres-Lopez II*). *Torres-Lopez* addressed the construction of ORS 137.370(4), which provides:

> "Unless the court expressly orders otherwise, a person who is confined as the result of a sentence for a crime or conduct that is not directly related to the crime for which the sentence is imposed *** shall not receive presentence incarceration credit for the time served in jail toward service of the term of confinement."

In *Torres-Lopez I*, we concluded that, in light of a 2015 amendment, the statute gives trial courts "discretion to order presentence incarceration credit that would otherwise be denied by that subsection." 373 Or at 827. Put simply, the 2015 amendment gave trial courts "the authority to order what would, in effect, be double credit." *Id.* at 837. We reiterated that conclusion in *Torres-Lopez II*:

> "Under the statute's default rule, a person is not entitled to credit for that time. But, under the statute's exception, a sentencing court can authorize credit for that time by expressly ordering it[.]"

374 Or at 431-32. It was undisputed in *Torres-Lopez* that the trial court "had expressly ordered that relator would in effect receive 'double credit'" under ORS 137.370(4). *Id.* at 425 n 1. For that reason, we had no reason to interpret the "expressly orders otherwise" provision in ORS 137.370(4) or "decide what a judgment must say" to reflect that a trial

court had "expressly order[ed]" double credit within the meaning of that statutory provision. *Id.*[3]

After we issued *Torres-Lopez I*, DOC undertook to reexamine the sentencing judgments and projected release dates for numerous adults in custody (AICs), including plaintiff. According to the state, in plaintiff's case, DOC's recalculation was based on its determination that the trial court judgment expressly provided for plaintiff to receive credit for time served on both counts pursuant to ORS 137.370(4). In other words, DOC concluded that the judgment required it to count plaintiff's time served against the first sentence and then again against the other consecutive sentence, "resulting in double credit for the same pre-judgment time served." Based on that recalculation, DOC determined that plaintiff's projected release date was in the past. Accordingly, in August 2025, DOC released plaintiff onto post-prison supervision (PPS).

In early November, a district attorney in Washington County filed a motion in the trial court, pursuant to ORS 137.172, to correct the judgment of conviction to state "that it is the intent of the Court that any credit under ORS 137.370(4) for one or more consecutive sentences in this judgment be applied a single time towards the total term of incarceration imposed as a result of those consecutive sentences." *See* ORS 137.172(1) ("The trial court retains authority after entry of judgment of conviction *** to modify the judgment, including the sentence, to correct any arithmetic or clerical errors or to delete or modify any erroneous term in the judgment. The court may correct the judgment either on the motion of one of the parties or on the court's own motion after written notice to all of the parties."). A hearing on the motion was scheduled for November 24.

At or around the same time, according to the state, DOC engaged in "additional deliberation" and "corrected"

_____

[3] It was also undisputed in *Torres-Lopez* that the sentences at issue in that case were for crimes that were "not directly related" to the crimes for which a sentence had been previously imposed, as required for ORS 137.370(4) to apply. For that reason, we had no reason to interpret the "not directly related" provision in ORS 137.370(4). In addition, unlike this case, *Torres-Lopez* did not involve consecutive sentences. We express no view at this time as to how those considerations may bear on the underlying question of how plaintiff's term of incarceration should be calculated.

its calculation of plaintiff's credit for time served. In other words, having already recalculated plaintiff's release date following the issuance of *Torres-Lopez I*, DOC changed course a second time with respect to its calculation of credit for time served. Based on its new recalculation, DOC determined that plaintiff still had time left to serve on his term of incarceration, and it set plaintiff's new projected release date for February 2027.

On November 22—two days before the scheduled hearing on the district attorney's motion to correct the judgment of conviction—DOC issued an "Order for Arrest and Return of Prisoner," which stated that plaintiff had "escaped from custody or ha[d] not completed service of [his] term of incarceration and is therefore a fugitive from justice and subject to arrest and detention in accordance with [ORS] 144.350."[4] The order directed any "Sheriff, Peace Officer, Parole Officer, or Corrections Officer" to take plaintiff "into custody and have [plaintiff] detained until an agent of [DOC] arrives and custody can be transferred to the agent." *See* ORS 144.360 ("Any order issued by the Department of Corrections or other supervisory authority as authorized by ORS 144.350 constitutes full authority for the arrest and detention of the violator, and all the laws applicable to warrants of arrest shall apply to such orders.").

Plaintiff appeared for the scheduled November 24 hearing in the trial court, where he was taken into custody pursuant to DOC's order. The district attorney's motion to correct the judgment was withdrawn on the ground that it was moot.

On December 2, plaintiff filed his petition for a writ of habeas corpus in this court, contending that he is unlawfully incarcerated. According to plaintiff, his "incarceration term has been served to completion under the correct application of his [credit for time served] as expressly allowed" in the judgment. In other words, plaintiff's position is that DOC's decision to release him from prison in August was correct and lawful because he had fully served his term of incarceration. Plaintiff further asserts that the state "ha[d] no legal authority to arrest and incarcerate him, and by

---

[4] The text of the statute is set out below at 374 Or at 629-30.

doing so [has] violated his constitutional rights and statutory provisions." Among other arguments, plaintiff contends that, having been released on PPS, due process principles entitled him to "a pre-deprivation notice and opportunity to be heard before a government agency summarily and secretly" deprived him "of his liberty by returning him to prison."

As we directed, the state filed a response, arguing that the judgment in this case did not expressly provide for double credit, that DOC's initial recalculation and decision to release plaintiff following *Torres-Lopez I* was in error, and that DOC properly sought to correct that error by recalculating plaintiff's release date a second time and taking plaintiff back into custody to complete his term of incarceration. According to the state, because DOC lacked authority to release plaintiff in August, plaintiff was on "constructive escape" status. The state further argues that, because plaintiff had "[e]scaped from the supervision, custody or control of the department," DOC had authority to order his arrest and detention under ORS 144.350. The state also contends that plaintiff did not suffer any violation of his constitutional rights, noting that he had the opportunity for prompt post-deprivation review to address any issues concerning his reincarceration, including the filing of a petition for mandamus or habeas relief or the filing an administrative grievance with DOC concerning the computation of his sentence.

After considering those filings, the court allowed plaintiff's petition and issued an order in the nature of a writ of habeas corpus. The court then heard oral argument on December 18. Having now considered the parties' filings and their oral arguments, we conclude that, under the circumstances of this case, ORS 144.350 did not authorize DOC to issue the order for plaintiff's arrest and return.

## ANALYSIS

ORS 144.350 provides, in part:

"(1)(a)  The Department of Corrections or other supervisory authority may order the arrest and detention of any person then under the supervision, custody or control of

the department or other supervisory authority upon being informed and having reasonable grounds to believe that such person has:

"(A) Violated the conditions of parole, post-prison supervision, probation, conditional pardon or other conditional release from custody; or

"(B) Escaped from the supervision, custody or control of the department or other supervisory authority.

"* * * * *

"(3) As used in this section, 'escape' means the unlawful departure of a person from a correctional facility, as defined in ORS 162.135, or from the supervision, custody or control of a corrections officer or other person authorized by the department or supervisory authority to maintain supervision, custody or control of the person while the person is outside the correctional facility."

As pertinent here, ORS 144.350 gave DOC authority to issue an order to arrest and detain plaintiff if DOC had reasonable grounds to believe that plaintiff had "[v]iolated the conditions of" his PPS or that he had "[e]scaped" from DOC's "supervision, custody or control." It is undisputed that plaintiff did not violate the terms of his PPS. Thus, DOC's statutory authority to issue the order hinges on whether plaintiff had "escaped," which is defined in ORS 144.350(3). Specifically, DOC's authority to issue the order for plaintiff's arrest reduces to whether DOC had reasonable grounds to believe that plaintiff had unlawfully departed from a correctional facility. *See* ORS 144.350(3) ("'[E]scape' means the unlawful departure of a person from a correctional facility, as defined in ORS 162.135[.]"); *see also* ORS 162.135(2) (defining "correctional facility" to include "any place used for the confinement of persons charged with or convicted of a crime or otherwise confined under a court order").

To understand the legislature's intended meaning of "unlawful departure," we examine "the text and context of the statute—including related statutes and case law—and then look[] to legislative history as necessary." *State v. Klein*, 352 Or 302, 309, 283 P3d 350 (2012) (citing *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009)). As noted, ORS 144.350(3) references a related statute, ORS 162.135,

which provides definitions for the crimes of first-, second-, and third-degree escape. Specifically, ORS 162.135(5) defines escape, as relevant here, to mean "the unlawful departure of a person from custody or a correctional facility." In other words, ORS 144.350(3) and ORS 162.135(5) define "escape" for purposes of this case similarly—*viz.*, the "unlawful departure of a person" from a correctional facility, and the former statute expressly cross-references the latter. For that reason, ORS 162.135 provides useful context in understanding the meaning of "escape" and "unlawful departure."

Although the definition of "escape" in ORS 162.135 has been amended since its enactment in 1971 as part of the Oregon Criminal Code, an "unlawful departure" has been a consistent feature of that definition.[5] "The definition of 'escape'" was intended to be "a restatement of its generally accepted legal meaning." Oregon Criminal Code, Final Draft and Report § 189, 193 (July 1970); *see also State v. Giron-Cortez*, 372 Or 729, 745, 557 P3d 505 (2024) ("This court considers the commentaries produced by the commission and its subcommittees as part of the Criminal Code's legislative history."). At the time that the statute was enacted, the legal definition of "escape" included (1) "[t]he departure or deliverance out of custody of a person who was lawfully imprisoned, before he is entitled to his liberty by the process of law"; or (2) "[t]he voluntarily or negligently allowing any person lawfully in confinement to leave the place." *Black's Law Dictionary* 639 (rev 4th ed 1968).

Unlike the definition of "escape," which was intended to be "a restatement of its generally accepted legal

---

[5] In 1971, the then-extant version of ORS 162.135(5) defined escape to mean "*the unlawful departure*, including failure to return to custody after temporary leave granted for a specific purpose or limited period, of a person *from custody or a correctional facility*." *Former* ORS 162.135(4) (1971), *renumbered as* ORS 162.135(5) (1991) (emphases added).

The current version of ORS 162.135(5) provides, in full:

"'Escape' means *the unlawful departure of a person from custody or a correctional facility*. 'Escape' includes the unauthorized departure or absence from this state or failure to return to this state by a person who is under the jurisdiction of the Psychiatric Security Review Board under ORS 161.315 to 161.351. 'Escape' does not include failure to comply with provisions of a conditional release in ORS 135.245."

(Emphasis added.)

meaning," the commentary noted that the "definition of 'unlawful departure' [was] new." Commentary § 189 at 193. However, the Criminal Code did not define the term "unlawful departure" and the term subsequently has not been defined by statute. The common meaning of "unlawful," includes "not lawful : contrary to or prohibited by law : not authorized or justified by law : not permitted or warranted by law" or "acting contrary to or in defiance of the law : disobeying or disregarding the law." *Webster's Third New Int'l Dictionary* 2502 (unabridged ed 2002) And the definitions of "departure" include, "removal from a place : the act of going away"). *Id.* at 604.

In addition, as noted, the legislature defined three degrees of the crime of escape. An "escape" from a correctional facility is a second-degree escape because of the additional risk involved. Commentary §§ 190-92 at 194; *see also* ORS 162.155 ("A person commits the crime of escape in the second degree if[,]" among other things, "[t]he person escapes from a correctional facility[.]"). Specifically, "[e]scape from a correctional facility evidences increased planning and premeditation. Such conduct threatens the security of correctional facilities by increasing the risk of escapes by other inmates." Commentary §§ 190-92 at 194.

In sum, the meanings of "escape" and "unlawful departure" are sufficiently broad to encompass a variety of circumstances. They are potentially broad enough to extend beyond what a lay person might consider the ordinary meaning of escape (*i.e.*, one involving intentional action by the person in custody) and may reach at least some scenarios in which an inmate is released through inadvertence or error by the custodial authority. Although we do not attempt to define the exact boundaries of those terms, we conclude that the circumstances here fall outside those boundaries even under the broadest permissible understanding of what can be considered an unlawful departure for purposes of ORS 144.350.

To recap, plaintiff was incarcerated in a correctional facility, serving a sentence. DOC recalculated his credit for time served based on its understanding of what the law required. After doing so, DOC determined that, under a

correct interpretation of the law, plaintiff's projected release date was in the past. As a consequence, DOC—acting with full knowledge of the facts and what it understood the law to be—released plaintiff from the correctional facility in August, and he began serving PPS. Thereafter, without any change to the underlying facts of which DOC was aware, DOC changed its view of the relevant law and again recalculated plaintiff's credit for time served. Under that new calculation, DOC determined that plaintiff had time left to serve on his term of incarceration. DOC then issued an order for plaintiff's arrest and detention pursuant to ORS 144.350. Pursuant to DOC's order, plaintiff was taken into custody and reincarcerated.

Whatever else "unlawful departure" may mean, we conclude that the legislature did not intend for it to include circumstances in which DOC (1) determines that a person is lawfully entitled to be released because he has served his term of incarceration; (2) pursuant to that determination releases the person from the correctional facility to begin serving PPS, *see Webster's* at 1917 (defining "release" to mean, among other things, "to set free from restraint, confinement, or servitude **:** set at liberty **:** let go"); and (3) later changes its mind as to whether the person should have been released. Under those circumstances, the person's departure from the correctional facility was not "unlawful" at the time of the departure, so as to authorize DOC to re-arrest the person released without any notice or process under the authority granted by ORS 144.350.

The text and context of the statute do not clearly compel one answer or another. As noted, the definitions of escape and unlawful departure are at least arguably broad enough to cover *some* circumstances in which a person, through no fault of his or her own, is erroneously released. At the same time, it would strain the meaning of "unlawful departure" to apply that term to a scenario where DOC makes a deliberate decision to release a person based on its application of the law to the undisputed facts, and later simply revises its view of the law. The state has cited no legislative history or other evidence that the legislature affirmatively intended for the meanings of "escape" or "unlawful

departure" to reach so far. And it is by no means obvious that DOC's *subsequent* change in view should be understood to retroactively make plaintiff's release "unlawful" when it occurred, particularly when the underlying merits of how to correctly interpret plaintiff's sentencing judgment are a subject of live dispute.

To the extent that the text of ORS 144.350 can plausibly be read in the manner that the state urges, we must be mindful of potential constitutional problems that could arise from such a construction. "It is a maxim of statutory construction that, when a statute is capable of more than one plausible interpretation, the court will avoid an interpretation that raises a constitutional problem." *Bonner v. American Golf Corp. of California*, 372 Or 814, 844, 558 P3d 812 (2024); *Westwood Homeowners Assn., Inc. v. Lane County*, 318 Or 146, 160, 864 P2d 350 (1993), *adh'd to as modified on recons*, 318 Or 327, 866 P2d 463 (1994) (rejecting a proposed interpretation of a statute that "arguably would infringe on * * * constitutional rights").

ORS 144.350 allows DOC to order the arrest and detention of a person on "escape" status without notice or hearing. Applying that statute to a circumstance in which a person has been told, under color of law, that he has completed his sentence and is free to go would, at a minimum, raise a substantial question of procedural due process under the United States Constitution. "The Supreme Court has repeatedly held that, in at least some circumstances, a person who is in fact free of physical confinement—even if that freedom is lawfully revocable—has a liberty interest that entitles him to constitutional due process before he is reincarcerated." *Hurd v. District of Columbia, Government*, 864 F3d 671, 683 (DC Cir 2017) (citing *Young v. Harper*, 520 US 143, 152, 117 S Ct 1148, 137 L Ed 2d 270 (1997) (pre-parole conditional supervision); *Gagnon v. Scarpelli*, 411 US 778, 782, 93 S Ct 1756, 36 L Ed 2d 656 (1973) (probation); *Morrissey v. Brewer*, 408 US 471, 482, 92 S Ct 2593, 33 L Ed 2d 484 (1972) (parole)).

This case does not involve parole, probation, or post-prison supervision; rather, it involves a person whom the

state contends should never have been released from prison in the first place. But that distinction is not dispositive of the potential due process issue. The state's own arguments indicate as much. In this case, plaintiff was arrested and returned to prison within months after being released. But the state's legal theory permitting plaintiff's arrest under ORS 144.350 contains no temporal limiting principle. Taken to its logical end, under the state's theory, a person released from custody would be subject to summary arrest and reincarceration years or even decades later (with no violation of PPS), so long as DOC in the intervening period had adopted a new understanding of the applicable law and determined that the person had time left to serve. At oral argument, the state candidly acknowledged that, in a hypothetical future case in which a person had been released from custody *years* earlier, that person may well have a constitutional liberty interest precluding a summary arrest and reincarceration without any predeprivation process. If such a liberty interest exists for a person after a period of years, we are unconvinced that it does not exist for a person released for a period of months.

In support of its argument, the state cited cases for the proposition that "[a] prisoner who is mistakenly released does not have a protected liberty interest because, unlike a parolee, he does not have a legitimate claim of entitlement to freedom." *Henderson v. Simms*, 223 F3d 267, 274 (4th Cir 2000) (internal quotation marks omitted). We are not persuaded by that conclusory statement by the Fourth Circuit. It is not consistent with the state's position at oral argument, in which the state allowed that, at least after some passage of time, a prison who was released in error might have a liberty interest sufficient to require, at a minimum, some notice and process before the state seeks to return the person to incarceration. Other courts have viewed the issue differently than the Fourth Circuit. A far more thorough analysis is found in *Hurd*, for example, where the District of Columbia Circuit reasoned that the mistakenly released prisoner in that case, "like a parolee, was able to be—and was—'gainfully employed and [] free to be with family and friends and to form the other enduring attachments of normal life.'" 864 F3d at 683 (quoting *Morrissey*, 408 US at 482 (brackets in *Hurd*)). It is not

necessary for purposes of our decision today to definitively resolve the nature of the liberty interest that attaches to a person who has been released under the circumstances that exist here. It is sufficient to note that such a person *arguably* has a liberty interest that would require predeprivation process, as the District of Columbia Circuit concluded in *Hurd*, in order to conclude that we should avoid a construction of ORS 144.350 that would raise a potential constitutional problem.

The state also relies on this court's decision in *Fredericks v. Gladden*, 211 Or 312, 315 P2d 1010 (1957), in which this court affirmed the trial court's dismissal of the plaintiff's habeas proceeding. In *Fredericks*, the plaintiff had been prematurely released and deemed to be a "constructive escapee." We stated that, "[i]f at a time when the defendant was illegally at large he was apprehended and returned to the penitentiary, his term not having then expired, we need not inquire how he got there." *Id.* at 326. For several reasons, we decline to rely on that wording in *Fredericks*. *Fredericks* predates ORS 144.350(1)(a)(B), the statute on which DOC relies in this case as the source of its authority to return plaintiff to custody. *See* Or Laws 1999, ch 120, § 2 (amending ORS 144.350 to, among other things, add ORS 144.350(1)(a)(B) and ORS 144.350(3)). Furthermore, there was no dispute in *Fredericks* that the "premature release" of the plaintiff in *Fredericks* had been "illegal" because the prison warden had erred in certifying that the plaintiff was entitled to the reductions set forth in the certificate when it was "conceded that the plaintiff was not so entitled." 211 Or at 324-25.[6] Finally, the court in *Fredericks* evidently had no reason to consider the due process implications that are significant to our construction of ORS 144.350 today.

---

[6] To reiterate, our decision today does not foreclose the possibility that there may be circumstances that constitute a "constructive escape." The state points to an administrative rule that addresses that concept. *See* OAR 291-100-0008(13) ("Escape: Unauthorized departure of an AIC from the physical or legal custody of the Department of Corrections. *Escape includes 'constructive escape' where an AIC has any unserved Department of Corrections felony sentence(s) and, by no effort of the AIC, is voluntarily absent from the Department of Corrections* (for example, where an AIC is released from custody after serving a local supervisory sentence despite the AIC having an unserved Department of Corrections felony sentence(s))." (Emphasis added.)). However, those circumstances do not exist in this case in which there is a dispute about whether plaintiff had an "unserved" sentence at the time that he was released in August.

In sum, we conclude that, under the circumstances of this case, ORS 144.350(1)(a)(B) did not authorize DOC to issue an order for plaintiff's arrest and return to custody. Accordingly, his present imprisonment is unlawful, and he is entitled to immediate release.

Having concluded that ORS 144.350(1)(a)(B) did not authorize DOC to issue the order pursuant to which plaintiff was arrested and returned to prison, it remains unclear how the state can proceed to resolve whether DOC lawfully released plaintiff in August, and, if it did not, return him to custody. As noted, before plaintiff's arrest, the district attorney had filed a motion to correct the judgment of conviction under ORS 137.172. Whether that statute applies in this context is an issue to be decided in a trial court in the first instance, and we express no view as to its applicability. Finally, to the extent that the state has identified a gap in the statutory scheme—another issue that we do not decide—filling that gap is an issue for legislative consideration.

## CONCLUSION

For the foregoing reasons, we conclude that, under the circumstances of this case, ORS 144.350 did not authorize DOC to issue the order for plaintiff's arrest and return and that, as a result, plaintiff's present imprisonment is unlawful. We order defendant to discharge plaintiff from custody immediately. *See* ORS 34.700(1) ("If it appears that the party detained is imprisoned or restrained illegally, judgment shall be given that the party be discharged forthwith[.]"). We further waive otherwise applicable appellate rules relating to reconsideration and the issuance of the appellate judgment, and we direct the State Court Administrator to issue the appellate judgment immediately. *See* ORAP 1.20(5) (permitting the court, for good cause and on its own motion, to waive any rule of appellate procedure); ORAP 9.25 (providing for reconsideration); ORAP 14.05(3)(b) (providing for the timing of the issuance of the appellate judgment).[7]

---

[7] ORS 34.700(2) provides that a court "shall include in the judgment an order that the defendant pay the attorney fees incurred by the petition, not to exceed $100," if "[t]he court enters a judgment requiring that the plaintiff be discharged" and "[t]he court finds that the allegations or defenses in the return were frivolous." Under the circumstances, we do not find that the state's position was frivolous. For that reason, plaintiff is not entitled to attorney fees under the statute.

It is hereby ordered that plaintiff immediately be discharged from his illegal imprisonment. Pursuant to ORAP 1.20(5) and notwithstanding ORAP 9.25 and ORAP 14.05(3)(b), the State Court Administrator shall issue the appellate judgment immediately.

**JAMES, J.,** concurring.

I agree fully with the majority. After calculating plaintiff's sentence, and releasing him from custody, the Department of Corrections (DOC) seized plaintiff, without a judicial warrant, under a claim of authority purportedly conferred by ORS 144.350(1)(a)(B), which provides that DOC may issue an "order" for the arrest and detention of individuals who have "[e]scaped from the supervision, custody or control of the department." That statute defines "escape" as "the unlawful departure of a person from a correctional facility." The majority aptly explains that, under the circumstances here, when DOC released plaintiff due to its own calculations, plaintiff did not *unlawfully* depart a correctional facility. Accordingly, the warrantless seizure of plaintiff was unlawful.

I write separately to raise two points that are best set forth in a concurrence—points that are intended to provide some practical suggestions to DOC and the trial bench and Bar as to how to apply our recent decision in *State ex rel Torres-Lopez v. Fahrion*, 373 Or 816, 819, 572 P3d 1045 (2025) (*Torres-Lopez I*), *adh'd to as modified on recons*, 374 Or 423, ___ P3d ___ (2025) (*Torres-Lopez II*).

It is common practice in Oregon for parties to request, and courts to include in a criminal judgment, the phrase "credit for time served," sometimes shortened to "CTS." When that is noted on a judgment, in my experience, the vast majority of the time, the parties and the court envision that the credit will be applied against the total period of incarceration, which typically occurs by applying it against the "primary" offense of conviction, as determined by ORS 144.079(1)(a)(A).

In *Torres-Lopez*, however, the trial court used different language. Rather than simply indicating "credit for time served," the trial court wrote on the judgment "credit for

time served since December 21, 2019[,] including time credited to Clackamas County case #18CR85288." *Torres-Lopez I*, 373 Or at 820. The trial court even amended the judgment to add further language: "The defendant shall receive incarceration credits pursuant to ORS 137.370(4) and (5) for all time since his arrest on these charges including any time served on other sentences during the time since his arrest on these charges." *Id*. at n 3.

The issue in *Torres-Lopez* was that, despite that specific language by the trial court, DOC applied the credit for time served in the same manner as it would have if the judgment had simply said "credit for time served," *i.e.*, traditionally applied against only the primary offense. *Torres-Lopez* did nothing more than remind everyone that, in 2015, the legislature had amended ORS 137.370(4), the statute that provides for credit for time served. That specific subsection states:

"Unless the court expressly orders otherwise, a person who is confined as the result of a sentence for a crime or conduct that is not directly related to the crime for which the sentence is imposed, or for violation of the conditions of probation, parole or post-prison supervision, shall not receive presentence incarceration credit for the time served in jail toward service of the term of confinement."

It was undisputed in *Torres-Lopez* that ORS 137.370(4) applied, because the defendant was "confined as the result of a sentence for a crime or conduct that [was] not directly related to the crime for which the sentence [was] imposed, or for violation of the conditions of probation, parole or post-prison supervision." And it was also undisputed in *Torres-Lopez* that the trial court had "expressly ordered" that defendant would receive credit for time held in custody on an unrelated case in another county. As we noted, "the text and context of ORS 137.370(4) support the conclusion that, after the 2015 amendment to the statute, courts had authority to grant what would otherwise be considered 'double credit' under the circumstances presented here." *Torres-Lopez I*, 373 Or at 828. In short, the 2015 changes to the statute provided the court the discretion to order what it had done, and DOC had erred in treating the court's specific

language in the judgment as a more generic indication of "credit for time served."

Again, *Torres-Lopez* did nothing more than remind the bench and Bar and DOC, that ORS 137.370(4) had been amended in 2015 to give trial courts the authority to order what would amount to "double credit" in limited circumstances. But the changes in 2015 to ORS 137.370(4) may not have translated to changes in practice by the bench and Bar. That is not uncommon—it is the case that sometimes routines of practice do not always keep pace with statutory changes. In light of *Torres-Lopez*'s reminder, however, from this point onward, practitioners and trial courts would be prudent to use caution in employing generic terms like "credit for time served" or "CTS."

In turning a careful eye to those terms, the first question they should ask is whether ORS 137.370(4) applies—that is, whether the court is considering presentence incarceration credit for custody time that is "not directly related" to the sentence that the court is imposing. If it is "not directly related," then they should ask the next question—whether the court should exercise its discretion to "expressly order" what would amount to "double credit." In those circumstances, practitioners and trial courts may need to speak with more precision. For example, if a trial court wants to apply credit to multiple counts, the trial court should explicitly state as much, as the court did in *Torres-Lopez*, by signifying the case number and count to which the court intends the credit to apply. And if the trial court does *not* want to exercise the discretion afforded under ORS 137.370(4), it may be wise to indicate that it is declining to apply credit for time served in the manner afforded under ORS 137.370(4), thus alleviating any uncertainty.

Although that is prudent practice going forward, the legislative change occurred in 2015. According to statements made by DOC in the case before us, there might be as many as 11,000 existing judgments implicated by ORS 137.370(4). And that brings me to my second point: How should DOC and the courts deal with judgments that have already been entered in cases where ORS 137.370(4) applied, yet the judgment issued prior to *Torres-Lopez*'s reminder, and therefore,

whether by routine of practice or intent, the judgment used the common generic language of "credit for time served," or "CTS," without clarification?

In the first instance, DOC should first confirm whether ORS 137.370(4) even applies, that is, whether the credit for time served ordered by the court was for time held in custody on a crime that is "not directly related" to the sentenced offense, as in *Torres-Lopez*. If the statute applies, then DOC should assess whether the trial court had clearly and unambiguously ordered "double credit" as the trial court did in *Torres-Lopez*, whether the trial court had clearly and unambiguously declined to order such credit, or whether the judgment is potentially ambiguous in that regard. If DOC determines that the judgment is potentially ambiguous, then DOC may need to seek a judicial determination of the intended meaning of the judgment. The precise procedural mechanism for doing so is not entirely clear.

In this case, the state filed a motion to correct the judgment, under ORS 137.172. That statute provides trial courts the authority to modify previously issued judgments "to correct any arithmetic or clerical errors or to delete or modify any erroneous term in the judgment." The parties have disputed whether, had those hearings actually occurred, the trial court would have had authority under that statute. In this case, the state argues that, in light of *Torres-Lopez*, a factual inquiry into the trial court's intent may be necessary to determine if the application of the credit for time served calculation was erroneous. In essence, the state's argument is that, when ORS 137.370(4) applies, simply entering "credit for time served" on a judgment either evidences an intent to not apply ORS 137.370(4) or at least creates an ambiguity in the judgment that may require clarification; via the ORS 137.172 process. Plaintiff argues that, even if ambiguous, ORS 137.172 provides for correction of erroneous terms, not ambiguous terms, nor erroneous *application* of terms, and therefore the trial court would lack authority under ORS 137.172 to modify a judgment that simply says "credit for time served," because those words, on their face, are not erroneous.

As the majority explains, we do not decide today whether ORS 137.172 is a viable procedural mechanism for clarifying a trial court's intent when, in a case where ORS 137.370(4) applies, it states in the judgment "credit for time served." There may be other procedural ways to resolve the ambiguity, as the state acknowledged at oral argument in this case. Regardless of the procedural mechanism, the critical point is that resolving an ambiguity in the judgment requires some judicial action; it is not something that DOC should determine unilaterally.

Any uncertainty as to whether ORS 137.172 would be a proper vehicle to clarify an ambiguous term in a criminal judgment could be resolved through a relatively minor statutory change. The statute could be amended to read, "to correct any arithmetic or clerical errors or to delete or modify any erroneous *or ambiguous* term in the judgment." Whether such a statutory change should be undertaken is a question left to the wisdom of the legislature.

Because I fully agree with the majority opinion, I respectfully concur.

Bushong, J., joins in this concurrence.